**The Michigan Insurance Co. v. Porter Kibbee and Others,**

AND

**Porter Kibbee and Another v. Joseph Thompson and Others.**

By a contract between P. and H. C. K. of the one part, and T. of the other, the former agreed to sell to the latter certain mill premises at $7500; and there being a mortgage upon a portion of said premises, and a decree in chancery obtained for the sale of said portion to satisfy another mortgage, for which mortgage and decree the holder had proposed to take $6000 in certain payments, the K.s authorized T. to pay that amount therefor towards the $7500 to be paid for said premises, and T. agreed to pay the same, but was to be at liberty to make any other arrangement with the holder he saw fit, but only $6000 to apply on the purchase; and if said mortgage and decree could not be obtained for $6000, then T. was to attend the sale to be made under said decree, and bid off the premises, and if obliged to bid more than $6000, to prevent any other person becoming the purchaser, then the K.s were to provide for the overplus — and $1500, the balance of the $7500, was to be paid by T. to the Michigan Insurance Company, within six months after he should acquire title to said premises,

KIBBEE v. THOMPSON.

to satisfy a subsequent mortgage on said premises held by said Company. By said contract, it was further provided that T. should be put into immediate possession of the said premises, and should deposit $300 with a third person, to be forfeited in case of non-performance on his part—both of which were done. The K.s, on T. performing, were to convey to him the premises. On a bill filed by the Insurance Company to foreclose their mortgage, and a cross bill filed by the K.s setting up these facts, it appearing that T., jointly with others, but in his name, had bought said first mortgage and decree, paying therefor over $6000, but without apprising the K.s of the necessity of paying more, or giving them an opportunity of negotiating for said claims, and T. had taken up the $300 so deposited by him, on the supposition, as he states in his answer, that the sale would be completed according to the contract, and the K.s, at the same time, with his assent, deposited quit-claim deeds of the premises, to be delivered to him when the mortgage and decree were discharged, and the persons buying with T. had knowledge of this contract at the time;—*Held*, That, although they went on afterwards and caused the premises to be sold to themselves, under the decree, for an amount that, with said mortgage, would make $6000, leaving about $1200 still back on the decree, the mortgage of the Insurance Company was still a lien on the premises, and T. and his associates were liable for the payment of the amount thereof, and that they should be enjoined from collecting the balance of the decree against the K.s.

T. was at liberty, under this contract, to negotiate for the first mortgage and decree as he saw fit, with the privilege of applying them at $6000 and no more, on his purchase—whatever might be the amount paid. If he saw fit, or thought it for his interest, to pay more, rather than allow sale to be made under the decree, the loss or the speculation—whichever it might prove—was his own.

In their answers to these bills, T. and his associates set up, as a defense, that the K.s had title only to an undivided two-fifths of the premises. The evidence as to the state of the title, was not satisfactory; but this objection appearing to be now taken for the first time, and being inconsistent with the acts of the defendants, and with their answers, which averred a willingness and readiness to perform T.'s engagements therein, claiming only that the whole amount paid for the first mortgage and decree should be applied on the purchase price of the premises,—*Held*, That this defense could not avail defendants.

The undertaking of T., in this contract, to pay the $1500 to the Insurance Company, was independent, except in point of time, of the engagement to take up the other mortgage and decree, and did not depend upon the amount he might have to pay to obtain such other mortgage and decree.

*Heard December 3d and 4th, 1858.  Decided June 3d.*

Appeal from Macomb Circuit in Chancery.

The Michigan Insurance Company filed their bill of complaint against Porter, Henry C., and Fanny Kibbee, Joseph Thompson, and Asa E. and Robert Hart, setting forth: That on the 9th day of June, A. D. 1851, Porter and H. C. Kibbee were indebted to complainants in the sum of $5116.23, upon a promissory note, to secure the payment of which, they, together with Fanny the wife of said Porter, executed to complainants a mortgage on the mill lot of

the Kibbees, in the village of Frederick, on Clinton River, and a lot adjoining in the bend of the river: That on June 10th, 1851, to secure the payment of the same moneys, the defendant Porter Kibbee and wife gave complainants another mortgage, upon other lands particularly described in the bill; and the two mortgages were properly acknowledged and recorded: That $1586.38 is now due on these demands: And that Thompson and the Harts claim some interest in the premises.

The bill then proceeds to state that, on January 5th, 1852, P. and H. C. Kibbee entered into an agreement in writing with Thompson, as follows:

"*This Agreement*, made and entered into this 5th day of January, A. D. 1852, between Porter Kibbee and Henry C. Kibbee, of Mt. Clemens, in the state of Michigan, of the first part, and Joseph Thompson, of Bridgeport, Connecticut, of the second part, *Witnesseth*,

" That the said parties of the first part, in consideration of the covenants and agreements hereinafter contained, hereby agree to sell unto the said party of the second part all those pieces and parcels of land bounded, known, and described as follows, to wit: All that certain piece or parcel of land lying and being in the town of Clinton, county of Macomb, and state of Michigan, a certain lot in the village of 'Frederick,' so called, in said town, known as the ' Mill Lot,' and being the same lot on which Kibbee's Mills, so called, are located, which said lot is bounded," &c.

"Also another piece of land lying in said village of Frederick adjoining to and north of the land above described, and lying within and filling the bend of said River Clinton, and bounded," &c.

"Also all other lots and real estate, in and to which the said parties of the first part have any interest in, claim or demand to, lying within the said village of Frederick aforesaid, including also the cooper-shop, dwellings, and grocery

store situated thereon; and also all that part, and no more, of the land known as the Thurston Farm, so called, in said town and county, as lies south of the 'ravine,' near the dwelling of Calvin Emerson, including the dam thereon, containing about twenty-eight acres, whether the same is included in said village plat or not,—for the sum of seven thousand five hundred dollars.

"And the said party of the second part, in consideration of the premises, hereby agrees to pay for said premises the sum of seven thousand five hundred dollars as hereinafter mentioned.

"And whereas a portion of said real estate was conveyed by two indentures of mortgage, by the said parties of the first part, to David N. Tuttle, of Buffalo, New York, one of which said mortgages was executed by the parties of the first part, October 16th, 1849, to secure the payment of the sum of three thousand dollars, and appears of record in the Registry of Macomb county aforesaid, in Liber M. of Mortgages, folios 1, 2, and 3; the other indenture of mortgage being executed by the parties of the first part and also by Fanny S. Kibbee, the wife of said Porter Kibbee, June 14th 1850, to secure the payment of the sum of three thousand five hundred and forty dollars, and appears of record in the Registry aforesaid and same liber, at folio 279, upon which last mortgage the sum of $540 has been paid; and whereas the said David N. Tuttle has filed his certain bill of foreclosure in the Circuit Court of the United States, for the District of Michigan in Equity, and has obtained a decree for a sale of a portion of said premises by virtue of the mortgage last above mentioned, and the said David N. Tuttle has proposed to take and receive, in full satisfaction and discharge of his said mortgages and decree, the sum of six thousand dollars, as follows: Three thousand dollars to be paid when said proposition shall by the parties be accepted, and the agreement therefor concluded; the balance (three thousand dollars) to be paid in three years as follows,—

Five hundred dollars each and every six months thereafter, with interest on the amount unpaid annually, and payable at the village of Mt. Clemens aforesaid at the rate of seven per cent.; and which said sum of six thousand dollars the said party of the second part hereby agrees to pay, and the same is to apply to that amount on the purchase price of the whole of said property, and he is at liberty to make such other agreement and terms with said Tuttle as he, the said party of the second part, may think proper, but the sum of six thousand dollars only, is to be allowed as aforesaid for the discharge and release of said mortgages, but the said six thousand dollars is to be paid by said party of the second part, provided said mortgages can not be released on better terms for a less sum.

"And whereas 'The Michigan Insurance Company of Detroit' also hold two other certain indentures of mortgage on said property, one of which is executed by the said Porter Kibbee and his wife, dated June 10th, 1851, to secure the payment of certain demands and debts therein mentioned, and is recorded in the Registry aforesaid, in Liber N. of Mortgages, folios 96, 97, and 98; the other mortgage executed by the parties of the first part hereto and the said Fanny S., wife of said Porter, also dated June 9th, 1851, to secure the payment of certain demands and debts therein mentioned, and recorded in Liber N. of Mortgages, folios 84 and 85, in the Registry aforesaid; and the said Michigan Insurance Company having agreed to accept the sum of one thousand five hundred dollars in full satisfaction and release of said premises hereby agreed to be conveyed, the said party of the second part hereby agrees to pay the same with interest, six months from the time when the title to the premises hereby agreed to be conveyed shall become vested in the said party of the second part.

"And it is further hereby covenanted and agreed, in behalf of the said party of the second part, that if the said

mortgages and decree of said David N. Tuttle, hereinbefore mentioned, can not be purchased and released for said sum of six thousand dollars, and a sale shall be made under said decree, that he, the said party of the second part will, at said sale, bid thereat and for said property the sum of six thousand dollars, less the amount due on the first of said mortgages to said Tuttle, if necessary to prevent any other person than the parties hereto becoming the purchaser thereof; and the parties of the first part hereby covenant and agree to provide for, and pay the balance of said decree, and the said first mortgage of said Tuttle, to the intent and purpose in that event that the amount to be paid by the said party of the second part shall not exceed seven thousand five hundred dollars, payable at the time and upon the terms and conditions the same as if the said mortgages and decree had been released and discharged as hereinbefore set forth.

"And the said parties of the first part hereby put and place the said party of the second part in the full and complete possession of all and every the said premises and the appurtenances thereto, in contemplation of and in part performance of this agreement.

"And it is further agreed and understood that in case of the destruction of the flouring mill on said premises by fire, or should the mill dam or bulkhead on said premises be carried away without the fault of the said party of the second part (and he using due care and diligence) before the consummation of said sale, then this agreement is to be wholly void and of no effect.

"And the said parties of the first part hereby covenant and agree that upon the performance by the said party of the second part of the covenants on his part to perfect said sale, they will make, execute, and deliver to the said party of the second part, and his heirs, good and sufficient deed or deeds of conveyance for said premises, the said party of the second part first executing and delivering such in-

denture of mortgage and other security as may be necessary for securing the balance of the purchase money of said premises remaining unpaid.

"And for the faithful performance of this agreement on the part of the party of the second part, he has deposited with the third person holding this agreement, the sum of three hundred dollars, for the purpose of paying for the use of said mill by the party of the second part, if said sale is not perfected, and being for three months, but should it be for a less time, owing to the destruction of said mill, bulkhead, or dam, then in that proportion; and if said sale shall be perfected, then said three hundred dollars shall be applied to the payment of said purchase price; and further, that the said party of the second part covenant and agree to pay to the said parties of the first part, in case of any default on his part in any of the covenants and agreements on his part to be kept and performed herein, the sum of one thousand dollars as fixed and settled damage by the parties.

"Witness whereof, the aforesaid parties have hereunto set their hands and seals, this 5th day of January, A. D. 1852." (Signed) "PORTER KIBBEE. [L. S.]" "(Signed) HENRY C. KIBBEE. [L. S.]" "(Signed) JOSEPH THOMPSON. [L. S.]"

"Signed, sealed and delivered in presence of "D. C. HOLBROOK." "ALEX. DAVIDSON."

The bill then alleges that, in pursuance of this agreement, Thompson entered into the premises described, and the sale contemplated thereby was fully perfected: That Thompson became thereby the owner of said premises, subject to the payment of $1500, and interest from the date of said agreement: That the Harts have become jointly interested with Thompson in said premises, with full knowledge of the agreement: And prays the usual decree for payment, and sale, &c., in default thereof.

The Harts answered, denying that Thompson had any interest in the premises described in complainants' mort-

gages, and claiming title in themselves to those covered by complainants' second mortgage, and to so much of the land covered by the first mortgage, and known as the Thurston Farm, as lies south of the ravine, near the dwelling of Calvin Emerson, including the dam thereon, containing twenty acres. They admit that Thompson and the Kibbees entered into the agreement set out in the bill, and that Thompson entered into the premises under the same, but deny that the sale thereby contemplated was ever perfected, or that Thompson ever owned, or claimed to own, the premises described in the agreement. They deny that Thompson became liable to pay said $1500 and interest, except upon condition that he could purchase the Tuttle mortgage and decree for $6000; or if he could not, then, if the Kibbees should pay off and discharge the balance thereof which might remain after Thompson should have bid at the sale $6000, less the amount of the first mortgage from the Kibbees to Tuttle. They claim title in themselves to the premises described in the Tuttle mortgage, by virtue of a deed executed by Geo. G. Bull, Master in Chancery of the Circuit Court of the United States for the District of Michigan, dated January 30th, 1852, and given on a sale made under the Tuttle decree; and also by virtue of a deed given by Thompson to A. E. Hart, October 4th, 1852. And they aver that Thompson performed the agreement with the Kibbees, on his part, according to the true intent and meaning thereof, and claim for themselves all benefit and advantage thereof.

Thompson also answered, denying any present interest in the premises, or that he is, or ever was, the owner thereof; or that he ever owned, or claimed to own them, subject to the payment of $1500 to complainants: Avers that, in pursuance of his agreement with the Kibbees, he did appear on the day on which the premises were sold under the decree, and bid $2300, which was $6000, less the amount due on the first Tuttle mortgage; and notified the Kibbees in writing, of his so bidding, on February

14th, 1852, and requested them to provide for, and pay, the balance due on said first mortgage. (A copy of this notice is given in the opinion.) He avers also that he could not purchase said decree and mortgage for $6000, and that he paid $7400, or thereabouts, therefor; that the Kibbees have neglected to provide for, and pay, the balance over the $6000, as they were in equity bound to do; and submits that he is not bound to pay complainants the $1500, and interest, or any part thereof.

The Kibbees filed a cross bill against Thompson, the Harts, and the Insurance Company, setting forth that prior to January 18th, 1852, they (the Kibbees) had been the owners of the property described in the mortgages, and had been engaged in the manufacture of flour; that they had become involved and embarrassed in their circumstances, and in order to secure their indebtedness to Tuttle, they executed and delivered to him the two mortgages described in the Thompson agreement hereinbefore set forth: That Tuttle filed his bill in the Circuit Court of the United States for the District of Michigan, March 28th, 1851, to foreclose his mortgage dated June 15th, 1850, and decree of foreclosure and sale was afterwards entered thereupon: That thereafter, and on the 5th day of January, 1852, they entered into the agreement with Thompson set out in the original bill: That such agreement was immediately deposited with William B. Wesson, as the third person to hold the same, and Thompson at the same time deposited with Wesson the $300 mentioned in the agreement, to be held by Wesson until the sale should be perfected, and Thompson immediately entered into possession of the premises: That immediately thereafter Thompson assumed exclusively the right to negotiate with Tuttle for his decree and mortgage: That the negotiation was conducted through the Harts, Thompson remaining in Detroit, and Tuttle being in Buffalo, and the two having no direct communication with each other. And they charge that, instead of complying with the terms of the offer of

sale made by Tuttle to the Kibbees, Thompson, for reasons unknown to them, failed and neglected to purchase the Tuttle mortgage and decree for $6000, as he might have done: That Thompson, as he had a right to do, made such other terms and agreements as he thought proper; but they allege that it was a great object for Thompson to purchase said mortgage and decree, even at $10,000. And they claim that Thompson, having made such terms as he saw fit in this purchase, as he might under said agreement, instead of having them released, as he should have done, took an assignment of said mortgage and decree without their consent: That the principal object they had in making the agreement with Thompson was to be immediately released from their debts and liabilities: That Thompson, instead of paying Tuttle down, as Tuttle's offer contemplated, paid but a small portion, and the balance remained unpaid for a term of years.

That on the 20th of January, 1852, Thompson told them he had paid said decree and mortgage in accordance with said agreement, and thereupon they gave him quit-claim deeds of the premises mentioned in said agreement: That Wesson then re-paid Thompson the $300 so deposited with him, and as Thompson had not then received from his agent at Buffalo the release of said mortgage and decree, the quit-claim deeds were deposited with Wesson, to be held by him until the papers should arrive, and the mortgage and decree be actually discharged of record: That, notwithstanding this, Tuttle having advertised under his decree, and Thompson having wrongfully taken an assignment of the decree and mortgage, the latter persisted in making sale under the decree, though they (the Kibbees) notified the master in writing that the decree and mortgage were paid, and objected to the sale: That Thompson, for himself and the Harts, who are averred to have been equally interested with Thompson in said agreement, bid at such sale $2300, and the premises were struck off to them for that sum, a deed given, and a report of the sale made by the

master, showing a balance still due from the Kibbees of $1205.81; for which Thompson claims execution: That after said sale Thompson served on them a written notice that Tuttle had withdrawn his offer to sell, and requesting them to provide for and pay the balance. And they insist that Thompson, under his agreement, was bound to pay the $1500 and interest to the Insurance Company, but they say that he now repudiates the agreement, and refuses to receive the deeds deposited with Wesson, but he and the Harts still retain possession of the property, to which they claim title only under the mortgage and master's deed: And they pray that the $1500 and interest be decreed still a lien on the premises, and Thompson and the Harts held liable therefor; and that they be directed to release the Kibbees from said mortgage and decree.

The Harts answered this cross bill, denying that the Kibbees were ever the owners of more than an undivided two-fifths of the mill property, and alleging that other persons named are the owners of the other three-fifths. They deny that Thompson assumed the exclusive right to negotiate with Tuttle for his decree and mortgage, as charged by the Kibbees: Admit that they concluded the negotiation for the purchase from Tuttle: Aver that they had frequent communications with Thompson in respect thereto, in which Thompson directed and urged them not to pay Tuttle over $6000: Deny that Thompson failed, neglected, or refused to comply with the terms of his agreement, but aver that he was anxious to make the purchase of Tuttle for $6000. And they say that for a long time previous to said agreement they had been desirous of purchasing mill property in Michigan, and for that purpose made an agreement with Thompson that he should make inquiries for such property; in pursuance of which he proposed to them to purchase with him the mill property in question: That the Kibbees represented to Thompson that they were the owners of a complete title to said mill property, and they (the Harts)

assented to the purchase thereof at $7500: That in pursuance of the agreement between Thompson and the Kibbees they offered Tuttle $6000 for his mortgage and decree, but he refused to sell at that price, and said he had withdrawn the offer he had made: That they then bought of Tuttle for the full amount due him, though urged by Thompson not to do so: That the assignment of the decree and mortgage was made to Thompson for the convenience of business, he being then in Michigan. Deny that the premises are worth more than $7500. State that they paid Tuttle $1500 down, with short credit for the balance, all of which, except $200, has been paid. That they got the best terms they could from Tuttle, but were obliged to pay more than they would have been had the Kibbees not interfered with the sale under the decree, and procured a postponement thereof from January 2d, 1852, when it was first advertised to be made, contrary to the interests of Tuttle: They deny knowledge of the quit-claim deeds from the Kibbees to Thompson, but insist, if executed, they did not vest the title in Thompson: Aver that the $6000 bid on such sale, less the amount due on the first Tuttle mortgage, was bid in accordance with Thompson's agreement, and claim the balance reported by the master as due on the decree.

They claim that in purchasing of Tuttle they did not act as agents for Thompson, but used their own money, and Thompson had no right to discharge the decree and mortgage, except with their assent. Admit that Thompson took and retained possession of the premises until October 4th, 1852, but since that time they have been in possession as of their own property, and not in joint interest, or as partners, with Thompson. Deny that they, or Thompson, repudiate his agreement with the Kibbees, but say they recognize the same, and claim that Thompson has performed on his part. Deny that they claim title only under the master's sale, but say they claim under said agreement also; and are willing to pay for the premises $7500, less

the amount paid Tuttle.     Allege that Tuttle, up to the time when the Kibbees procured a postponement of the sale under his decree contrary to his wishes, was willing to take $6000, as he had offered, but that he then withdrew his offer, and, through Stevens, his agent, notified H. C. Kibbee of such withdrawal, and both Thompson and the Kibbees knew of such withdrawal when they entered into the agreement:     That the Kibbees fraudulently concealed the fact that they owned only a two-fifths interest in the premises; and that they, the Harts, paid more for the Tuttle decree and mortgage than all the interest of the Kibbees in the premises was worth.

Thompson also filed an answer to the cross-bill, containing, in the main, the same admissions and averments contained in the answer of the Harts.  He denies that he ever informed the Kibbees that he had paid the Tuttle decree and mortgage, though he might have told them he and the Harts had become the owners on 20th of January, 1852.  He admits the excution of the quit-claim deeds by the Kibbees as alleged, but denies that they were executed at his request. Says he deposited the $300 with Wesson, as security that he would perform his part of the agreement, and make all reasonable and proper exertions to purchase the Tuttle decree and mortgage for $6000, and, in case of failure so to purchase, the $300 to be held as security for rent:  That when he informed the Kibbees of the purchase of Tuttle, it was then considered by all that the purchase would then be completed according to the agreement, and thereupon Wesson returned the $300, with the assent of the Kibbees. Denies that the quit-claim deeds were deposited with Wesson at his request, or that he ever agreed to discharge said decree and mortgage, unless complainants would pay the balance over $6000:  And submits that the execution of the quit-claim deeds was not a performance by the Kibbees of the agreement on their part to convey to him.

On the hearing on the pleadings and proofs, the circuit

court made a decree in accordance with the prayer of the bill and cross bill, and Thompson and the Harts appealed.

The testimony in the case was voluminous, and it is not considered necessary, to illustrate the decision, that it be set forth here.

*H. D. Terry*, and *J. M. Howard*, for appellees.

*Eldredge & Hubbard*, and *D., S. A. & D. Goodwin*, for appellants.

MARTIN Ch. J.:

The Michigan Insurance Company was the holder of two mortgages executed by the Kibbees, at the time the contract between them and Thompson was executed, and at the same time one David N. Tuttle, of Buffalo, was the holder of two other mortgages upon a portion of the same premises, of prior date to those of the Insurance Company; the second of which had been foreclosed, and the property advertised for sale by a master under the decree of foreclosure. Tuttle had offered to discharge the first mortgage, and the decree of foreclosure, for the sum of six thousand dollars, one-half to be paid down, and the residue in three years, by semi-annual installments of five hundred dollars each, with interest; and the Insurance Company had also offered to take one thousand five hundred dollars in satisfaction and discharge of its mortgages; and these offers of the Company and of Tuttle were known to Thompson, and were the basis of the contract between the Kibbees and him. With such knowledge, and in the hope of securing the benefit of these offers, the contract of January 5th, 1852, was entered into. By it, the Kibbees agreed to sell, and Thompson to purchase, the property covered by the several mortgages, for seven thousand five hundred dollars, which was to be paid in the following manner: Thompson was to pay six thousand dollars to Tuttle, to satisfy his claims against the Kibbees, and one thousand five hundred to the

Insurance Company for a like purpose, and each payment was independent of the other, as we will endeavor presently to show. The six thousand dollars was to be paid to Tuttle, if it should be found necessary to pay so much, to procure the release of his mortgage and decree; but Thompson was at liberty to make any better, or any other, bargain he could with Tuttle; but the sum of six thousand dollars only was to be allowed to him for obtaining the discharge of these debts, whatever might be the price at which he should procure it, and that sum was to be allowed to him in any event. The instant Tuttle was satisfied his debts, the sum of six thousand dollars was paid upon this purchase from the Kibbees, irrespective of the cost to Thompson: the speculation was his, the profit or loss equally accruing to him, as circumstances or his choice might determine. But because Tuttle might not adhere to his offer to discharge the mortgage and decree for six thousand dollars, or Thompson be unable from any other reason to procure such discharge, a provision was inserted to meet such a contingency, and Thompson agreed that in such event, if the property should go to sale under the decree, he would bid at such sale the six thousand dollars, less the amount due on the first mortgage, if necessary to prevent a purchase by any other party; and as this would not be sufficient to satisfy the decree, interest, and costs, the Kibbees were to provide for and pay the balance of the decree and the first mortgage, so that the amount to be paid by Thompson should not exceed seven thousand five hundred dollars, to be payable at the same time, and upon the same terms and conditions, as if the mortgage and decree had been discharged by Tuttle without sale. In other words, the parties contracted that if the property should be sold by the master, Thompson should bid a sum equal to the remainder after deducting the amount of the first mortgage from the sum of six thousand dollars, and as such bid would not satisfy the decree, the Kibbees were to provide for the balance, and were also to take up

the first mortgage, which would remain still outstanding; and Thompson was to pay to them the balance over and above his bid, so as to make the amount of six thousand dollars, in semi-annual installments of five hundred dollars and interest, as it was contemplated and provided he would pay Tuttle if the negotiation was consummated with him, and the sale of the property prevented.

The residue of the seven thousand five hundred dollars —viz. one thousand five hundred dollars—was entirely separated from this transaction respecting the Tuttle mortgage and decree, and dedicated to another use. This sum, Thompson agreed he would pay to the Insurance Company for the satisfaction of its mortgages, six months after he should have acquired a title to the premises; and this he was entitled to have immediately upon his procuring a release of the mortgage and decree from Tuttle, by negotiation, or after the sale under the decree, if a sale should be made, and he bid thereat as provided in the contract. The time, and nothing but the time, for this payment was contingent upon the success of Thompson's negotiation with Tuttle, as, if that was consummated, the title would be presently conveyed to him, while if the property should be sold, and the Kibbees be compelled to pay off the first mortgage, a longer or a shorter time might elapse before they could convey, according to circumstances. This conclusively shows that this payment was in no way contingent upon the amount of the residuum left after paying Tuttle's mortgage and decree.

The Kibbees, on their part, agreed to convey the property to Thompson upon his performance of his covenants; he first executing such mortgage or other security as might be necessary for securing the payment of whatever balance of the purchase money might remain unpaid, which might be more or less according to the result of his negotiation with Tuttle, but would at least cover the ob-

ligation to pay the debt of the Kibbees to the Insurance Company. Thompson was put into immediate possession of the premises, and they are yet held by him or the Harts, under that surrendry, and, as we shall see, under the contract. The contract was deposited with one Wesson by the parties, and Thompson, at the same time, deposited with him three hundred dollars to be paid to the Kibbees as and for rent, if the sale to him was not perfected in the way contemplated in the contract, or to be applied towards the payment of the purchase price; that is, be refunded, or appropriated towards the satisfaction of the decree and mortgage, as the case might be, if the sale should be consummated.

From this synopsis of the contract it appears that Thompson was restricted to two methods of extinguishing Tuttle's claims; first, by negotiation, in which case, whatever he paid, more or less, he was to be allowed six thousand dollars therefor; and, second, by bidding at the sale, in which case the Kibbees were to provide for and pay the balance of the decree, as also the first mortgage; so that in either or any event, in whatever mode Tuttle was satisfied of his claims, and for whatever consideration he released them, such discharge and release should cost the Kibbees no more than six thousand dollars, unless the property should be sold under the decree, and they be compelled to pay to Tuttle, for the discharge of the mortgage, a sum which would increase that amount; in which event, Thompson would only be required to pay them sufficient over his bid to make the six thousand dollars.

He could, in no event, compel them to pay more than six thousand dollars, to discharge the Tuttle claims. They might be compelled, it is true, to do so, but that necessity was left contingent only upon the necessity for a negotiation by them with Tuttle for the discharge of the mortgage, which could only arise after a sale under the

decree; and the right to make this negotiation the Kibbees reserved to themselves.

The amount which Thompson should pay to Tuttle for a release of his decree and mortgage was therefore a matter of indifference to the Kibbees, as was to him the amount which they should pay to Tuttle for a release of the mortgage in case of a sale under the decree.

The Kibbees, in their bill, charge and insist, among other things, that immediately after the execution of the contract, Thompson assumed exclusively the right to negotiate with Tuttle, who resided at Buffalo, and that the negotiation was conducted through the Harts at his request, without any direct communication between him and Tuttle; and they charge, substantially, that he executed the contract upon his part, so far as relates to the Tuttle mortgage and decree, by negotiation, and without sale, although he purchased the same for a sum exceeding six thousand dollars (which they claim was at his peril under the contract), and took an assignment instead of a discharge and release, which they insist was contrary to the terms and true intent of the contract, and was without their consent: That afterwards, he informed them that he had paid the decree and mortgage, and was the holder thereof, and that they thereupon executed to him quit-claim deeds of the premises mentioned in the contract (part only of which were included in the mortgages to Tuttle), at his request and to his satisfaction, and deposited them, with his consent, with Wesson, to be held until the release of the mortgage and decree should arrive from Buffalo, and that, at the same time, Thompson, with their consent, withdrew the three hundred dollars deposit.

The defendants Hart and Thompson, in their answers, admit the contract, and the deposit of three hundred dollars by Thompson, but deny that he thereafter assumed the exclusive right to negotiate with Tuttle for the purchase of the mortgage and decree.

We can discover but one object in making this denial, viz. to establish a standpoint from which to argue that the purchase by the Harts of the mortgage and decree was upon their own account, and independent of Thompson's contract. Its falsity and utter worthlessness for such purpose will be manifested as we examine the other portions of the answers, and the evidence.

In their answers they admit, notwithstanding this denial, that the Harts concluded the negotiation with Tuttle for the purchase of the mortgage and decree, and that during such negotiations there were direct communications between themselves respecting it, and that in all such communications, Thompson directed and urged them to pay but six thousand dollars for such decree and mortgage. And they deny that Thompson failed, neglected, or refused to comply with the terms of Tuttle, as set out in the contract; but they aver that, on the contrary, he was always ready, willing, and desirous of purchasing the mortgage and decree for six thousand dollars. The Harts, in their answer, aver that they had for a long time been anxious to purchase some mill property in Michigan, and had agreed with Thompson to make inquiries for them; and that, in pursuance thereof, he proposed to them to purchase the property of the Kibbees with him, which, after learning the situation of the property, they agreed to do for seven thousand five hundred dollars. Thompson, in his answer, substantially admits the same facts.

The defendants Hart, in their answer, further aver that in pursuance of the true intent and meaning of the agreement of Thompson and the Kibbees, they (the Harts) did propose to Tuttle to purchase from him the decree and mortgage for six thousand dollars; that he declined to sell for that price, and that they then, in pursuance of the contract, bought them for the amount due upon them, and insist that they had a right so to do. But they say that Thompson urged them not to pay over six thousand dollars. They also insist that they paid their own money for the mortgage and decree

and that Thompson has no right or title to them; and they deny that in such purchase they acted as agents for Thompson, but claim that they acted for themselves; and Thompson, in his answer, avers that the Harts paid their own money, against his express instructions not to pay over six thousand dollars.

These are a portion of the inconsistent statements of the Harts and Thompson upon the subject of the purchase and of Thompson's interest; and although these answers are not evidence (the oath having been waived), they may be examined as to the defenses set up, to illustrate the faith with which the defendants, making them, have acted, and with which they contest the Kibbees' claims against them. Here we find them at one time claiming that Thompson had never assumed the exclusive right of negotiation with Tuttle, and yet admitting that he was in constant communication with the Harts, directing and limiting them in such negotiations. We find that Thompson acquired his right to negotiate with Tuttle from the agreement; under which, and in consideration that he would act in the matter for the Kibbees, a contract of sale and purchase was made, and possession of the premises surrendered to him; and we also find that he, through the Harts, attempted to purchase the mortgage and decree for six thousand dollars, and instructed and limited them to the payment of that amount (he evidently understanding the true import of the contract, as also knowing the object and intention of the parties); and we find the Harts insisting that they have executed the contract according to its true intent and meaning, and that they bought under it, asserting no privity of contract with the Kibbees, claiming only to act under Thompson's power, claiming no purchase or assignment from him, but admitting that they agreed with him, upon his representations, to purchase with him the property in question; and after all this, insisting that they bought with their own money, and that Thompson has no right or title to the mortgage and decree, and deny

ing that they acted as his agents in the purchase, but claiming that they acted for themselves; and from all these inconsistencies, they would seem to seek to have the court deduce the crowning inconsistency that they bought independently of any agreement with, or authority from, any one, and yet bought under the contract in question, according to its terms and import, and in execution of it.

We will now look into the testimony bearing upon this branch of the defense. Holbrook, who drew the contract between Thompson and the Kibbees, swears that immediately after its execution there was considerable conversation between the parties to it as to the best manner of communicating with Tuttle about accepting and closing with his offer to take six thousand dollars for the mortgage and decree, and that Porter Kibbee proposed to go through Canada to see him, but that Thompson dissuaded him from this by telling him that he could telegraph *an agent of his* at Buffalo, which would answer the same purpose, and that Kibbee assented to that arrangment. Tuttle testifies that the Harts attempted to purchase the decree and mortgage for six thousand dollars, and failing in that, they purchased them for seven thousand two hundred and ninety-one dollars, all paid down, or very soon, except three thousand dollars, for which sum he took drafts in five hundred dollars each, payable every six months, precisely as to time, and substantially in manner, it will be observed, in which the three thousand dollars not paid down was to be paid by the terms of the contract; a coincidence remarkable if not designed. He also testifies that the mortgage and decree were assigned by him to Thompson at the request of the Harts, without any reason given for such request, and that they stated to him that they would have an interest with Thompson in the property.

The testimony of these witnesses, coupled with the admissions of the Harts and Thompson, in their answers, evidence a want of candor on Thompson's part respecting the manner in which he intended to conduct the negotiation with

Tuttle, if they do not show a fraudulent design, and intentional concealment of his connection with the Harts; and also establish the fact that the Harts assumed to act under Thompson and his contract, complied with the •latter so far as the terms of payment of the three thousand dollars were concerned, and expected to have an interest with him in the property, through the execution of the contract. If then they paid their own money, it was by way of advance to Thompson, and not as an independent investment. When Thompson dissuaded Porter Kibbee from negotiating with Tuttle in person, to secure a release of the decree and mortgage on •the most favorable terms to himself and Henry C., he did it, we must presume, so as to secure to himself the exclusive control of the negotiation; and whether with honest or fraudulent intent is immaterial. He represented the Harts as his " *agent* "; it is impossible to conclude from the evidence but that they must have known the terms of his contract, and whether they expected to have an interest with him in the property or not, they must be held to have acted for him, and to have advanced and paid what money they did, for him and not for themselves. Whatever may have been their private understanding, it was concealed from the Kibbees, who knew Thompson only; and he must be considered as having operated through the Harts in the negotiation; and they can claim nothing for themselves adversely to the Kibbees' rights under the agreement. Or, to assume the position of the defendants Harts and Thompson, if Thompson was acting on behalf of them all, they are all bound by his contract, and his acts and declarations; and their acts will be construed as his alone.

The evidence nowhere discloses the fact that Thompson informed the Kibbees of his connection with the Harts, nor does it show that the Harts informed Tuttle, or that he ever knew, that they were negotiating for Thompson, or for him and themselves, or under a contract with the Kibbees; nor does Thompson's name appear to have been used until in-

structions were given that the assignments should be made
to him. Thompson, in this particular, appears to have deceived
the Kibbees, and, perhaps, to have been himself deceived by
the Harts. However, this may be, neither of them can com-
plain if they are held to the consequences of the deception.
Thompson can not, if he intentionally concealed from the
Kibbees his connection with the Harts, and by their act was
obligated with them in a greater amount to Tuttle than he
contemplated; and if deceived by the Harts, and their pre-
tence be true that they bought with their own money and
for themselves, he suffers nothing, and they will not be per-
mitted to make any thing from their double fraud.

Nor do the Harts and Thompson pretend that the Kibbees
ever knew of the existence of the Harts while these nego-
tiations were carried on. Thompson studiously kept them out
of sight. Had the Kibbees been told that they were con-
cerned with Thompson in the subject of the contract, ad-
ditional and perhaps stronger reasons might have occurred
to the Kibbees why they should attempt the negotiation
with Tuttle personally. The evidence most clearly shows
that it would have been better for them had they done so.
After the purchase had been made and the assignment of
the mortgage and decree had been executed to Thompson,
he still kept up in the Kibbees the impression that he had
negotiated with Tuttle through his agent, and gave them to
understand, according to Wesson's and Holbrook's testimony,
that the negotiation had been conducted according to the
contract, and took back his deposit of three hundred dollars
upon that representation; for we can not suppose it would
have been given up otherwise. Thompson also told Holbrook,
in the presence of Henry C. Kibbee, that he had purchased
the mortgage and decree from Tuttle, but had not yet received
his papers, and that he had purchased through *his agent*, but
did not know upon what terms. He afterwards, and when
the Kibbees deposited deeds of the property with Wesson,
and he withdrew his deposit of three hundred dollars, gave

the Kibbees to understand the same thing, and that, as his papers had not then arrived, he could not then deliver to them the release of the decree and mortgage, but that when they did arrive the Kibbees were released from their engagements; and to keep up the deception, he also told them that *he* had paid more to Tuttle than he expected; and inquired of Mr. Holbrook, who was present, whether the Telegraph Companies were liable for mistakes. These facts indicate that the defense, so far as regards the rights of the Harts, and their purchase for a sum exceeding six thousand dollars, and their claim for the excess, was either concocted after the negotiation with Tuttle, or was fraudulently designed and contemplated from the beginning, but concealed until after the three hundred dollars could be obtained back, and a title obtained under the master's sale; and however we may regard the transaction as between the defendants, as between them and the Kibbees it was grossly fraudulent.

But this is not all of the inconsistency of these defenses, nor of the conduct of the parties making them. The Kibbees charge in their cross bill, that Thompson, after the transaction with Tuttle had taken place, and he had acquired the mortgage and decree, insisted upon making sale under the decree, against their wishes and objections, and that he and the Harts, bid at such sale for the property two thousand three hundred dollars, and it was struck off to them at that price; upon which they claim that a deficiency of one thousand two hundred and five dollars remains, which they insist upon collecting; and that after such sale Thompson served upon them a written notice informing them that Tuttle had withdrawn his proposition, and requiring them to provide for the balance due on the decree &c.; all which they insist is fraudulent.

These things, the defendants by their answers substantially admit, and do insist upon the benefits of the sale, and claim that the Kibbees should execute the contract as though such sale had been made by Tuttle. The testimony upon this

point shows a most wanton attempt to overreach the Kibbees.
Holbrook testifies that when Thompson informed the Kibbees
that he had perfected the negotiation with Tuttle, quit-claim
deeds of the property were prepared and executed by them,
which were examined by Thompson, and the parties then
agreed that the deeds should be deposited with Wesson,
and the three hundred dollars returned to Thompson; all
which was done. That at that time it was stated that
Thompson was to have the property sold under the decree,
to get title through that also; and it was agreed that he
was to be at the expense of that sale. That, Kibbee or
Thompson, both being present, stated that when his papers
transferring the decree and mortgage came, the Kibbees
were released from all their engagements under the contract:
That Henry C. Kibbee said they were anxious to avoid all
risks on their part of the dam being carried off, and as
Thompson had not got his papers, and wanted to get his
title under the decree, the deeds were to be deposited
with Wesson, and Thompson was to get his money; and
Thompson said he wanted a sale under the decree, and as
he had not got his papers from Buffalo he could not then
discharge the decree and mortgage. Wesson testifies that
when the deeds were deposited with him, he asked the
parties if the matter was arranged between them, and under-
stood from them that it was. Walker testifies that on the
same day, and after the deposit of the deeds with Wesson
(for we find from all the evidence that this must be the time),
Thompson and Kibbee were in the Bank of the Insurance
Company, to arrange the claim of the Company against the
property: That he told them the property could be released
for one thousand five hundred dollars, or upon Thompson's
giving his note for that sum at six months: That a note
was drawn in blank, and a release of mortgage executed and
placed in the hands of the cashier to be delivered to Thomp-
son when he signed the note. At this time Thompson said
he had purchased the property and would sign the note: That

afterwards (and when this afterwards was, will be sufficiently apparent when we consider the conduct of Thompson at and after the sale), Thompson came into the Bank, and said he had concluded not to sign the note. Mr. Bull testifies that on the 30th of January he sold the property under the decree; that Thompson bid it off, and directed the deed to be made to the Harts: That at that time Kibbee asked Thompson if he had an assignment of both mortgages, and that Thompson said he had; that Kibbee then asked him if he was ready to discharge them according to the agreement, and that Thompson evaded an answer, when Kibbee objected to the sale.

This sale, it is manifest, was intended and expected at the time Thompson took up the deposit of three hundred dollars and the Kibbees deposited their deeds of the property, to be at the expense of Thompson, for the purposes of his title, and in no way connected with, nor to affect, the contract, or the rights of the parties; at any rate, such were the Kibbees' expectations, based upon Thompson's representations and acts. His whole course at that time, his conversations and statements to them, to Holbrook and Wesson, and his arrangement with Walker, can be explained in no other way than that it was understood the contract was in reality executed by both parties, so far as the extinguishment of Tuttle's claims and liens were involved. Certainly the Kibbees so understood it, and had a right to understand it, and if Thompson did not, it is because he was maturing his fraudulent schemes upon them. Not until the time of the sale, so far as the case shows, had the Kibbees any suspicion, or reason for suspicion, that they were in danger of being overreached.

Immediately after the sale, Thompson served the notice upon the Kibbees referred to in their bill, and admitted in the answer. This notice sufficiently explains why he informed the Insurance Company that he had concluded not to sign the note for one thousand five hundred dollars,

and fully reveals the fraudulent designs of himself and the Harts respecting the Kibbees in their misfortunes. It is as follows:

"*Mt. Clemens*, February 4th, 1852.

"To PORTER KIBBEE and HENRY C. KIBBEE: Gents,— You are hereby notified that I have been unable to pur-chase or obtain a release of the two mortgages executed by you to David N. Tuttle, and referred to and specified in a written contract entered into between you and me on the 5th day of January, 1852, the said David N. Tuttle having withdrawn his proposition in said contract mention-ed, and having refused to assign or release the said mort-gages for the sum of six thousand dollars. You are fur-ther notified that in pursuance of said contract, I attended at the time and place when and where the premises in the said mortgage described were advertised for sale under and by virtue of the decree in said contract specified and mentioned, and at said sale did bid for said premises in said decree mentioned, the sum of two thousand three hundred dollars; which sum of two thousand three hundred dol-lars was' the amount of six thousand dollars less the amount due on the first mortgage by you executed to said David N. Tuttle. You are therefore hereby further notified to provide for and pay the balance remaining over on said decree, and the amount due on said first mortgage."

It is unnecessary to recapitulate the evidence already referred to, to show that this notice is false in letter and false in spirit; that it could only have been devised for the purpose of fraud; and that the claim for payment of the excess over six thousand dollars, paid in procuring the de-cree and mortgage, is founded in fraud also. If these things evidence good faith, and an honest intention to execute the contract, and are consistent with honesty and fair dealing we can imagine no case where fraud, as a fact, can be proven, or where equity will withhold its aid to enforce iniquitious demands.

It will be observed, that in this notice Thompson formally informs the Kibbees that Tuttle had withdrawn his offer to take six thousand dollars for the decree and mortgage, and he and the Harts allege in their answers, and insist as a ground of equity, that it was entirely through the perversity of Henry C. Kibbee in forbidding the sale on the 2d of January (three days before this contract was executed) that they failed to procure the discharge of the decree and mortgage for six thousand dollars; and they claim as a result that they were therefore justified in paying seven thousand three hundred dollars, and in insisting that the Kibbees shall refund to them the excess. But they also aver in their answers that the contract, which was made on the 5th of January, was made with full knowledge on the part of Thompson of what Kibbee had done, and that the offer of Tuttle had been, in consequence, withdrawn, and that no offer of Tuttle then existed. This admission of the answers throw light upon the character of the notice, and if such be the fact, it fortifies the position we have already assumed, that Thompson took his chances under the contract, hoping, and perhaps expecting, that he could induce Tuttle to renew it, but in any event running the risk of the speculation; and clearly under such circumstances as precludes any claim of bad faith on the part of the Kibbees, from which he and the Harts can claim any equities to themselves.

Another ground of defense remains to be noticed, viz.: that the Kibbees represented themselves to Thompson as having good title to the premises, and that, in fact, they had not; and that the deeds deposited with Wesson, for this reason, do not satisfy the contract. This defense is inconsistent with the other parts of their answers, and is wholly unsustained by the evidence. At the time Thompson withdrew the deposit of three hundred dollars, which could only have been withdrawn upon the assumption that the contract, so far as related to Tuttle's claim, had been

executed, deeds for the whole property were deposited with Wesson for Thompson, to remain until the release should be produced. Thompson at that time admitted that the contract was performed on their part thereby. On the the same day, and before the deposit of the deeds (as we infer from the testimony of Wesson and Holbrook), they were examined by Thompson in Holbrook's office, and their deposit was agreed upon. The Kibbees expressed their anxiety to perform all that could be required of them, and stated the contents of the deeds; and one of them (Porter Kibbee) explained to Thompson the condition of the different parcels. It was then, and upon that information, arranged that Thompson should have the property sold under the decree, to get title through that source also, but at his own expense. These facts, and others which have been already adverted to, are hardly consistent with the assumption that the Kibbees falsely represented the title, or that Thompson was ignorant of its true condition, whatever that may be. The answers also show that this defense is not made in good faith, but is a mere "make weight." The Harts admit that Thompson disclaims these deeds because the complainants have not provided for and paid the balance of the decree and mortgage, and they offer yet to pay any balance that may be found due from them, after allowing them the seven thousand three hundred dollars for their purchase, but no pretence is set up of a disclaimer because of defect of title; and they continually insist upon a claim of the title by virtue of the agreement. Thompson also admits that he disclaims the deeds, and assigns a like reason, "because complainants have not fulfilled their covenants" in providing for or paying the balance of the six thousand dollars over and above the sum bid by him at the foreclosure sale. And this is the only reason really assigned for refusing to accept them. He also insists upon the agreement, and the title under it, and avers, as do the Harts, that he has ever been ready

and willing, and he offers, to pay to complainants the balance of seven thousand five hundred dollars remaining unpaid, after deducting therefrom the amount paid Tuttle for the decree and mortgage. Under this kind of defense, and this evidence, it is of little moment what the title of the complainants was. From the evidence of title, we have no satisfactory information respecting it, but we do know that Thompson was informed respecting it, and that all the defendants still insist upon and claim under the agreement, and are still willing to perform it on their part, if they can draw out of the complainants the excess above six thousand dollars which they fraudulently paid Tuttle for his claims. Under these circumstances we regard this defense as fictitious, and unworthy of serious consideration.

Thompson and the Harts must either repudiate the contract altogether, or execute it — they can not claim rights and benefits under it, and repudiate it at the same time.

From a consideration of the whole case we are satisfied that Thompson pursued neither of the two modes contemplated in the contract for the·extinguishment of Tuttle's claims; that the Harts acted with him, and are bound by his contract and acts and declarations, as well as he by theirs, and that they have no rights independent of his, superior to those he can assert; and that the whole transaction has been grossly fraudulent towards the Kibbees.

By the purchase of the decree and mortgage they deprived the Kibbees of a right, reserved by the contract, to negotiate with Tuttle, and provide for the payment of the first mortgage, and the balance of the decree remaining after Thompson's bid, if a sale by Tuttle should take place — a power which, in their embarrassed condition, might be valuable to them; but by that purchase they put themselves in the place of Tuttle, and in a condition to release the decree and mortgage for the six thousand dollars. The power to negotiate, which the Kibbees reserved, so as to procure the release for as small a sum as possible if the

property were sold, can now be exercised so that the contract shall be executed according to its true spirit; the will which it was feared Tuttle might not exercise, Thompson and the Harts now control, and they must be held to perform that which they contracted to procure Tuttle to perform, so long as they have voluntarily placed themselves, and that by their own fraud and bad faith, in his place, and in a condition to do it. If a loss occurs to them, they can attribute it to their own voluntary act, in departing from the contract, by which they were empowered by the Kibbees to procure the release of the decree and mortgage, and which they undertook to perform. They can claim no rights independent of the contract, or power, except that conferred by it, so long as they claim under it, which in this defense they persist in doing : and whatever they have done under it, inures to the Kibbees' benefit.

In this examination we have omitted to notice the case made by the original bill, and the answers of the Harts and Thompson to it. These will be found to be utterly inconsistent with those to the cross bill of the Kibbees, and further show, if such be necessary, the falsity and bad faith of the defenses, and the fraudulent character of their whole conduct relative to the execution of the contract. Nor have we shown all of the inconsistencies of the defense to the cross bill; but enough, we apprehend, has been shown to render it evident that the Insurance Company, and the Kibbees, are entitled to the relief they have asked.

The decree of the court below must be affirmed, with costs of the complainants in the original and cross bill to be taxed against the defendants Thompson and the Harts, and this cause must be remitted to that court for execution of the decree.

MANNING and CHRISTIANCY JJ. concurred. CAMPBELL J. did not sit, having been of counsel.