# ALBERT GRANT ET AL.

## *vs.*

# HENRY D. COOKE ET AL.

1. By the terms of the organic act of February 21, 1871, it is provided that the legislative assembly created by said act shall not increase the aggregate debt of the District beyond 5 per cent. of the assessed property of the District, unless the law authorizing the increase be submitted to a vote of the people of the District. *Held*, by a majority of the court, that the debts of the old corporations of Washington, Georgetown, and the Levy Court are not to be estimated as part of the "aggregate debt" contemplated by the organic act, and therefore the act of the legislative assembly, approved July 10, 1871, authorizing a loan and creating an indebtedness of the new government in the amount of $4,000,000 does not, increase said "aggregate debt," beyond the prohibited amount, and is, consequently, valid. Wylie and Olin, J. J. dissenting, Mac Arthur, J., holds further that—

2. Bonds issued in pursuance of an act void upon its face are illegal and void in the hands of any one who may purchase them, whether they be purchased in good faith or not.

3. It is a rule in construing statutes to compare the statute with other statutes of the same legislature upon the same or similar subjects, in order to ascertain its meaning ; and it is to be inferred that all statutes relating to the same or similar subjects are governed by the same policy, and have the same scope and design.

4. It is the duty of the court to consider all the parts of the statute in order to render it harmonious, if possible.

5. The government of the District of Columbia provided by the Act of February 21, 1871, is not a mere municipality in its restricted sense, but is to be placed upon the same footing with that of any of the States or Territories within the limits of the law from which it derives existence.

6. It is a cardinal principle in our political system that the great divisions of Government—the Executive, Legislative, and Judicial —are to exercise their respective powers free from the interference of each other.

7. The head of the Executive Department cannot be enjoined from enforcing the execution of a general law affecting only public rights.

8. A bill in equity by a private citizen to restrain the enforcement of a public law, cannot be maintained, unless the complainant be threatened with an injury peculiar to himself, and the special grievance of which he complains must not only be possible and imminent, but be clearly set up.

9. The constitutionality of the organic act of 1871, is a question not made in this case, and, therefore, not considered by the court.

In Equity No. 1956.   Full Bench.   Decided November 11, 1871.

APPEAL from a decree granting an injunction.

## STATEMENT OF THE CASE.

The Legislative Assembly of the District of Columbia, by an act approved July 10, 1871, appropriated $4,000,000, until the expiration of the first fiscal quarter after the adjournment of the next regular session of the Legislative Assembly, for the improvement, &c., of streets, &c., in the District of Columbia, and for the construction, &c., of sewers, &c., to be used and expended according to the provisions of the Act of Congress, entitled "An act to provide a government for the District of Columbia," approved January 21, 1871.   Stat. at Large, 419.

It was further provided that the appropriation of four million thus made should be disbursed upon warrants of the Board of Public Works upon the Treasury of the District.

To place the Treasury in funds to meet this appropriation, the act authorized the Governor to issue bonds to an amount of $4,000,000—$1,500,000 to be sold during the the year 1871, and $2,500,000 during the period ensuing between the 1st day of January, 1872, and the expiration of the first fiscal quarter after the adjournment of the next regular session of the Legislative Assembly, the said bonds to be payable in twenty years from the date of their issue, with interest at 7 per centum per annum.

In order to pay the interest and gradually extinguish the principal of the debt, the act provided that a "sufficient sum shall be annually levied."

On the 25th of July, 1871, this bill was filed by Albert Grant, George W. Riggs, Wm. B. Todd, Marshall Brown, Francis Mohun, Fitzhugh Coyle, Jesse B. Wilson, William

Gunton, Henry S. Davis, James B. Dodson, William G. Metzerott, John Purdy, Joseph B. Bryan, George H. Plant, William N. Phillip, Thomas L. Hume, and John Van Riswick against Henry D. Cooke, Governor of the District of Columbia, and president *ex officio* of the Board of Public Works, and Alexander R. Shepherd, Samuel P. Brown, James A. Magruder, and Alfred B. Mullett, members of the Board of Public Works, and Edwin L. Stanton, the Secretary of the District, and the Comptroller of the District, and Treasurer of the District, to prevent the loan authorized by this act from being made.

On the same day Mr. Justice Wylie granted a rule to show cause why an injunction should not issue, restraining the officers of the District, charged with the execution of this act of the Assembly from issuing and disposing of such bonds, or the proceeds thereof on the grounds—

First. That the acts contemplated were illegal and prohibited by the act commonly known as the "organic act," approved February 21, 1871. Stat. at Large, 419.

Second. Because the aggregate debt of the District already amounted to $3,349,121; that the assessed value of property in the District was $77,191,946.37, and, that by the Act of Congress referred to, the aggregate debt of the District could not be increased by any debt which would swell said aggregate beyond 5 per centum of the assessed value of the property of the District, unless the law authorizing such debt be submitted to a vote of the people, and receive the majority of the votes cast at a general election, which had not been ordered.

Third. Because by the "organic act" the Legislature is prohibited from appropriating an amount of money which shall exceed the amount of revenue authorized to be raised in the same space of time the appropriation is made for, and this appropriation of $4,000,000 greatly exceeds the authorized amount, and that as the twentieth section of the organic act limits the rate of taxation to a maximum

of 2 per cent. in any one year; which would be at the rate of 2 per cent. on $77,000,000—far below the sum of $4,000,000 appropriated, and this latter sum would be more than double the amount allowed by law to be raised.

On the coming in of the answer the court, Mr. Justice WYLIE sitting, made the injunction perpetual.

Whereupon this appeal was taken by the defendants to the General Term.

The existence of the dissolved injunction led to the passage of the Act of August 11, 1871, which authorized the Governor to anticipate the revenue of the District to the extent of $500,000 for the purpose of the improvement and repair of the streets, etc. Acts of Assembly, 1st session, 35.

It was under this act that the limited work done by the Board of Public Works was carried on until after the dissolution of the injunction.

Messrs. J. J. COOMBS, A. G. RIDDLE, W. S. COX and T. J. DURANT for complainants.

The answer of Governor Cooke, among other things, denies that he was about to issue the bonds as charged, and denies indeed all the material averments of the bill.

But these denials are mere illusions, and only justifiable by an oblique view of facts, as will be seen by the admissions and allegations made by Cooke in the sixteenth to the twentieth articles of his answer on pages 27 to 32 of the record.

It is not necessary to notice specially, as we think, the demurrers and answers of the other parties defendant.

In support of the conclusions of law reached complainants rely upon the following points and authorities:

1. The District of Columbia is a body corporate for municipal purposes, which may sue and be sued, implead and be impleaded, and exercise all other powers of a municipal corporation not inconsistent with the Constitution and laws of the United States and the act of its crea-

tion. See Act of Congress of February 21, 1871, Sec. 1, Stat. at Large, 419.

2. Municipal corporations, like all others, have no other powers than those specially conferred upon them, and all exercise of power in excess of this is null and void in law. Minturn *vs.* Larne 23, 1 Howard, 436; Pittsburgh C. C. RR. *vs.* County of Alleghany, 13 Smith (Pa.), 135; Commonwealth *vs.* N. E. RR. Co., 3 Casey (Pa.), 339; Beatty *vs.* Knowles, 4 Peters, 152.

3. The taxing power of this corporation is limited to 2 per cent. on the assessed value of property in the District, and a corporation cannot tax beyond the rate prescribed in its charter. Act of Congress of February 21, 1871, Section 20, Statute at Large, 423. The United States *vs.* The Mayor and Council of Burlington, 2 Am. Law Register, N. S., 394.

4. Objections to the form of the Act of the Legislative Assembly of the District of Columbia, of July 10, 1871, and appearing on the face of the act itself.

(*a*) It embraces three different subjects; it makes an appropriation of four millions; it provides for the issuing of bonds; it directs taxation to pay the principal and interest of them; only one of these objects is expressed in the title of the act; and it is void as to all its subjects not expressed in the title. See Act of Congress of February 21, 1871, Section 12, Statute at Large, 422. Proviso, end of Section 14, Statute at Large, 423.

(*b*) The ninth section of the District act violates the provision of the organic act, Section 12, by not showing that two-thirds of the members directed the act to go into effect without the delay of thirty days.

5. Objections to the substance of the act of the Legislative Assembly of the District of Columbia of July 10, 1871, appearing on the face of the act itself.

(*a*) The first section of the District act, employing the language of the fourteenth section of the Act of Congress, appropriates four millions of dollars "until the expiration

of the first fiscal quarter after the adjournment of the next regular session of the Legislative Assembly." Hence, before an appropriation could be made, the Legislative Assembly was bound to fix the time of commencement of its next session, as the Act of Congress directed it to do; and not having done so, appropriations were illegal. See Act of Congress of February 21, 1871, Section 5, Statute at Large, 421, line 16, and Section 14, 422, lines 1 to 5.

(*b*) The second section of the District act authorizes the Board of Public Works to make contracts generally according to a plan made by that board alone, the details of which are not expressed in the act; while the Act of Congress declares that the Board of Public Works shall have no power to make any contract until after specific appropriation therefor shall have been made by the Legislative Assembly. See Act of Congress of February 21, 1871, Section 15, lines 5 and 6, 423. See Act of Congress, February 21, 1871, Section 37, 427, lines 23 to 30.

(*c*) The third section of the District act authorizes the Board of Public Works to disburse the four millions by their own warrants on the Treasury. This, in effect, transfers the control of the Treasury from the legislature to the board, in plain violation of the Act of Congress. See Act of Congress of February 21, 1871, Sections 13 and 14. Story's Com. on Const., 213–14, Section 1342. Lyons *vs.* Jerome, 26 Wendell, 435.

(*d*) The sixth section of the District act directs the proceeds of the bonds, when sold, to be deposited in the Treasury, and authorizes the Board of Public Works to draw it out in violation of the Act of Congress. See Act of Congress of February 21, 1871, Sec. 5, lines 1, 2, and 3, page 420; also Sec. 13, page 422.

(*e*) The seventh section of the District act either does or does not provide for the levying of a tax to pay for the interest on the loan; if it does make such provision, then it must be because the loan would increase the aggregate

debt of the District beyond 5 per centum of the assessed value of the property in the District, and such a loan can only be contracted when sanctioned by a popular vote, which is not provided for in the bill; all in violation of the Act of Congress. See Act of Congress of February 21, 1871, Sec. 14, lines 11 to 24, pages 422, 423.

(*f*) The first section of the District act makes an appropriation of $4,000,000 without establishing an equation between that amount and the amount of revenue to be raised during the term for which the appropriation is made, which omission violates the Act of Congress. See Act of Congress of February 21, 1871, Sec. 14, lines 7 to 10, page 422.

6. Objections to the substance of the Act of the Legislative Assembly of the District of July 10, 1871, arising from facts *dehors* the bill.

(*a*) The debts of the old corporations, *i. e.*, Washington, Georgetown, and Levy Court, are the debts of the new corporation, the people incorporated are the same; the old corporations expired on the 1st of June, 1871; the new corporation is their successor. See Act of Congress of February 21, 1871, Sec. 40, lines 1 to 6, page 428; also Sec. 41, lines 1 to 5, page 428; also Sec. 41, lines 9 to 12, page 429.

(*b*) The debt of the extinct corporations amounts to $3,349,121, and the assessed value of property is $77,191,- 946.37; to add four millions, making an aggregate of over seven millions of debt, would be 10 per cent. on the assessment instead of 5, the limit to which the Act of Congress restricts the power of the Legislative Assembly of the District. See Act of Congress of February 21, 1871, Sec. 14, lines 10 to 14, 422.

(*c*) At the date of the passage of the Act of the Legislative Assembly of July 10, 1871, the time of the meeting of the next regular session had not been fixed; it was subsequently fixed by the Act of August 18, 1871, on the fourth Monday of April, 1872. All appropriations, then,

of the last session must expire at the end of the first fiscal quarter after the close of the session commencing Monday, April 4, 1872. The session will continue sixty days only, and expire June 24, 1872.

By the act of the Legislative Assembly of the District of August 22, 1871, the fiscal year commences on July 1, and the first fiscal quarter after the next regular session of the Legislative Assembly of the District will expire September 30, 1872, somewhat less than fifteen months after the 10th of July, 1871, when the Legislative Assembly appropriated four millions over and above all the money destined for the ordinary expenses of Government, while the whole amount they had power to appropriate during that time was two per cent. on $77,000,000, or about $1,600,000. See Act of Congress of February 21, 1871, Section 14, 422.

(d) Subsequently to the act of the Legislative Assembly of the District of July 10, 1871, they passed an act on August 19, 1871, for the same purposes as the former act, proposing to borrow the same amount of money in the same way, and placing it as an appropriation at the disposal of the Board of Public Works, with an additional provision for submitting the question of the loan to a popular vote. This new legislation is a legislative recognition of the illegality of the Act of July 10, and an acquiescence in the decree of the court below sustaining the injunction, which renders vain the present appeal.

7. There can be no objection on the ground of the parties plaintiff.

(a) It is self-evident that a solitary tax payer has a right to enjoin in a proper case; *ergo*, sixteen others may join with him for the same cause. As for the other tax payers, suppose that they all thought the tax was right, and refused to join, how would that take away the right of the one man who chose to resist? See Dodge *vs.* Woolsey, 18 How., 336; Mayor of Baltimore *vs.* Gill, 31 Md., 376; Merrill *vs.*

Plainfield, 45 N. H., 126 ; Webster *vs.* Forrester, 32 Conn., 131; Smith *vs.* Appleton, 19 Wis., 468; De Bann *vs.* Mayor of N. Y., 16 Barbour, 392 ; Foster *vs.* Coleman, 10 Cal., 278 ; Pope *vs.* Halifax, 12 Cush., 440; Smith *vs.* Miles, 15 Cal., 643.

(*b*) If the other tax payers were willing to join, but do not, this is no objection, for as they are very numerous, many thousands in number, manifest inconvenience would be produced. See Rules in Equity U. S. S. C., No. 48; and rule in equity of this court, No. 36; Story's Equity Pleading, Secs. 94, 95, 96.

(*c*) After this, for the defendants to urge that the complainants are misjoined and that these interests are not identical, is to blow hot and cold with one breath, and cannot be listened to.

Nor as to parties defendant.

8. All the defendants are agents in the execution of a common illegal purpose and are therefore properly joined as defendants.

9. The court has jurisdiction of the cause.

(*a*) The District Government is a municipal corporation, and may sue and be sued by the express provision of the first section of the Act of Congress of February 21, 1871.

(*b*) The nature of the case made in the bill brings it clearly within the jurisdiction of equity. Without the aid of chancery there would ensue a multiplicity of suits.

Otherwise than in relief by an injunction, irreparable injury will be produced, since if the bonds go into the hands of innocent purchasers, the property for the whole District is bound for their payment.

So far as the proceeding of the Legislative Assembly in the provision of the Act of July 10, 1871, are valid, they require extrinsic evidence to show its invalidity. Story's Equity Jurisp., Sections 908, 928, 64 k; Dowes *vs.* City of Chicago, 11 Wallace, 111.

Mr. SAMUEL L. PHILLIPS for defendants:

1. The bill is fatally defective in not having the proper parties.

Wherever the question is one of a common or general interest, the general rule that all parties in interest must be made parties to the suit is waived, and one or more may sue for the benefit of the whole. "But a few will not be permitted to bring a bill of this sort, without saying in the bill that it is brought on behalf of themselves and all the rest," etc. Story Eq. Pl., Section 99.

Where parties form a voluntary association for public or private purposes, or parishioners, or inhabitants of a town "a bill must be brought on behalf of all the parties in interest; for if it be brought for the plaintiffs alone, it will not be sustained by the court for want of proper parties." Story Eq. Pl., Sections 107–115.

As to defendants:

"All persons legally or beneficially interested in the subject-matter of a suit should be made parties;" in other words, "all persons who are interested in the object of the bill are necessary and proper parties."

"If complete justice between the parties before the court cannot be done without other parties being made, whose rights or interests will be prejudiced by a decree, then the court will stay its proceedings." Story Eq. Pl., Section 77.

"The District of Columbia as a body corporate for municipal purposes," is not made a party to this bill, but simply the Board of Public Works, the Governor, and its officers.

"The District of Columbia," as a municipal corporation, is deeply interested in the object of the bill, and the court cannot grant its prayer without affecting its rights. This determines it should be a party to the proceeding. Suing Henry D. Cooke as Governor and *ex-officio* President of the Board of Public Works, and Edwin L. Stanton, as Secretary, is not making the corporation a party. The first section of the organic law makes it "a government by the name of the District of Columbia, *by which name* it is hereby consti-

tuted a body corporate for municipal purposes, and may sue and *be* sued."

2. Has a court of equity jurisdiction to grant an injunction as prayed at the suit of private citizens, admitting, for the purposes of the argument, the law to be unauthorized by the organic act?

It is submitted that the legislative, executive, and judicial branches of the District of Columbia are distinct and thoroughly independent.

Had it been supposed at the bar that this court would, in any case, interpose by injunction, to prevent the execution of an unconstitutional Act of Congress, it can hardly be doubted that applications with that object would have been heretofore addressed to it. Occasions have not been wanting.

The constitutionality of the act for the annexation of Texas was vehemently denied. It made important and permanent changes in the relative importance of States and sections, and was by many supposed to be pregnant with disastrous results to large interests in particular States. But no one seems to have thought of an application for an injunction against the execution of the act by the President.

The Congress is the Legislative Department of the Government; the President is the Executive Department. Neither can be restrained in its action by the Judicial Department; though the acts of both, when performed, are, in proper cases, subject to its cognizance.

We are fully satisfied that this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties. State of Mississippi *vs.* Johnson, 4 Wall., 475.

The analogy is in many respects perfect between the foregoing case and the present.

The duties of the Governor of this District and his associate defendants are public, and not that of a private trust, in which any one citizen is to be either pecuniarily bene-

7DC—12

fitted or injured. To restrain by injunction the issuance of these bonds necessarily involves an investigation by the court into the assessed value of the property of the District, an estimate of the public debts, a complete auditing and comptrolling of the amount of bonds to be issued, those returned as cancelled, those repurchased by the Government, and when the amount shall exceed a certain sum; in a word, you transfer from the offices of the new government the financial management of the District to the tables of an auditor in chancery. The law devolves this duty upon the Executive, and a court of equity has neither the power by statute, nor by its inherent constitution to enter upon such an investigation.

Analagous cases may be mentioned. Suppose Congress authorized the Secretary of the Treasury to issue and have in circulation one hundred millions of bonds, and it was alleged that he was about to issue double that sum. Can it be pretended that a bill for a injunction against the Preident and Secretary would be sustainable at the suit of a private citizen.

If so, the officers of the Government might be subject to constant litigation by hundreds of thousands of separate suits, and their whole time expended in the maintenance of the legality of the law under which they act.

If so, the court would be compelled to employ the army of Treasury clerks, in order to determine when the issuance of bonds exceeds the amount allowed by law. To do this would require accurate lists of bonds sold, of bonds redeemed, of bonds destroyed, of reissued bonds, of bonds lost, of bonds registered and not registered—in a word, it would require the keeping of the vast and complicated accounts of the Treasury.

Suppose the Secretary of the Navy was authorized to build ten vessels of war, would a bill of injunction to prevent him building fifteen be sustainable at the suit of a private citizen or any number of them? Again, if the

Comptroller of the National Currency was about to issue currency to national banks in excess of the amount allowed by law, can the court restrain him?

In all of these cases clearly not, because the officers are in the execution of a public trust, not cognizable in a court of equity, and if injury happens by their unlawful proceeding, it is a public injury, of which no man's private rights suffer in particular more than those of his fellow citizens; and for this reason, together with the inconveniences attaching to any remedy in equity, prevent suit at his instance. And yet in every case above mentioned those private rights are affected.

Every citizen owning property in the United States bears a heavier burden when the debt is increased by an unlawful issuance of bonds to the extent of $200,000,000 instead of $100,000,000, and he may be compelled to pay, and his private property levied upon and sold for its payment if he refuses.

To build fifteen ships of war when only ten are sufficient, increases the burden of debt, and each citizen's property is liable to pay it.

We therefore see that although unlawful acts are about to be consummated, which will inevitably fall upon the citizen, yet there is no redress at the suit of the citizen in the courts of equity, when the officers are in the performance of a public trust, and the injury complained against is not a private injury which he suffers exclusively, or in a greater proportion than his fellow-citizens, but is an injury which falls upon all alike.

So strongly is this principle maintained that the courts of equity cannot restrain a public officer in the performance of his public trusts; that the Supreme Court of the United States, in the above-cited case, refused the injunction prayed for by the State of Mississippi, although her rights as a State were violated by acts of Congress which, for the purposes of the argument, were admitted to be unconstitutional.

If this doctrine is applicable to a State suing to restrain injuries to her individual rights, how much more strongly does it apply when private citizens seek to become the champions of public rights.

And so it has been decided that " an action to have the act of a board of supervisors, in erecting a new town, declared null and void, and to restrain proceedings for its organization, cannot be maintained by persons having no other interest than one common to all the freeholders of the proposed town." David J. Doolittle vs. Supervisors, 18 N. Y., 162.

"A town passed a vote to refund to its selectmen the expense they might incur in defense of a suit brought against them for a violation of their official duty respecting elections, and directed its treasurer to pay to the counsel employed by the selectmen to defend such suit. A minority of the voters, who were legal voters, and who, together, were liable to pay more than one-half of all the taxes to be assessed on the inhabitants of that town claimed to be illegal filed a bill in equity praying that the officers of the town might be restrained by injunction from carrying such vote and direction into effect: Held, That the equity jurisdiction did not extend to this case." Hale vs. Cushman, 6 Met. (Mass.), 425.

The principles elaborated above apply with equal force to the new government of the District of Columbia.

Its executive, legislative, and judicial branches are independent and distinct, in strict analogy to those of the general Government, and the same limitations of power and rules of construction are applicable to each, as the same deleterious consequences would flow from their non-observance.

In the administration of the principles of justice in the ordinary cases of private rights, we so constantly recognize the maxim "that there is no injury without its remedy," that when we come to the consideration of questions affecting

the public we are apt unconsciously to apply the same rule.

The ordinary cases of nuisances, where the injuries arising from them are public, do not entitle a citizen to bring an action unless he has suffered some special damage over those of other citizens. The Government, as the guardian of the public rights, can alone institute an action for the abatement of the public injury. Tapping on Mandamus, 288.

Admitting for the purpose of argument, that the debts of the old municipal corporations are to be included in estimating the aggregate debt of the District, nevertheless, the bill of the plaintiffs is premature, in that there is no "assessed" value of the property of the District at this moment, and the court cannot, in the absence of any allegation of fraud, receive evidence to ascertain what it may be.

The right to determine what the assessed value of the property may be, is a province of duty confided in the first place to the new government, and it is submitted, unless upon an allegation and proof of fraud, or evident mistake, the decision of the Government will be accepted by the court.

It will, therefore, be contended that the old assessments of the old corporations do not show the assessed value of the property of the District, as contemplated by the act, and until such assessments are made by the new government, the court will presume, in the absence of fraud, that the legislature was acquainted with the value of the property, and to what sum the assessments would amount, and that they have passed no illegal law creating a debt greater than 5 per cent. thereon.

The terms "assessed property of the District" refer to "the District" in the sense of the new government (Section 1), in contradistinction to the three old corporations; and if such is the meaning, the terms import "the assessed property of the new government," and not the assessed property of the quasi-merged corporations.

The assessments of the three corporations are not the assessments of "the District."

The new government has the power, and it is its duty, to order assessments. In execution of this duty such a bill has been already introduced, and passed one branch of the legislature.

To admit that the old assessments are binding on the new government, you conclude a party to acts of which he had no notice, made by officers and agents whom he did not appoint, and upon principles which he might deem defective.

Unless there is some expression in the organic law which makes the assessments of the three corporations the assessment of "the District," and none exist, there is at this moment no assessment of the property of the District.

It will probably be contended that as the new government became the successor of the rights of the old, and it has acquired no new property, that the assessments of the corporations may fairly be said to represent the assessed property of the District. This may be and it may not be true; at all events "the District," as a new government, is not bound by the acts of the old corporations. Congress knew that the last assessment of the city of Washington took place nearly three years ago; that vast and unprecedented improvements have taken place in Washington since that period, enhancing the value of property all over its limits, and to confine it to such old assessments would be unduly restricting the progress of improvement.

Another, and perhaps stronger reason for the same conclusion, that in estimating what debt may be contracted, we are to take the assessment to be hereafter made by the District, exists in the fact that a large amount of government property is authorized to be assessed by Section 36, which was never before the subject of taxation. It is upon the whole of this assessed property that the right of contracting a debt is to be based.

For these reasons it is submitted that the plaintiffs are premature in asking an injunction, as there is no "assessed property of the District," and in the absence of such the court must presume, where there is no allegation of fraud, that the legislative and executive branches are acquainted with the true value of such property, and that neither will violate the law.

We shall next consider the case upon the merits. The important question of the present suit is whether the limitation of power imposed upon the new government, which prevents it from contracting an aggregate debt of more than five per cent. of the assessed property of the District, includes, in estimating said debt, the pre-existing debts of the old municipal corporations.

To determine this question, let us look in the first place at the condition of the District at the time of the passage of the act, and it will at once be apparent how insignificant and inadequate the provisions of the act would be to answer the exigencies of the occasion if the construction contended for by the other side were true.

Congress knew that the District was a large territory of land, most highly favored in climate and health, and susceptible of the highest cultivation and adornment, and yet far behind the spirit of the age in improvement. With magnificent avenues and streets, laid out simply upon the maps of the city, with no pavements and no sewerage to invite the expenditure of capital. With a canal costing millions of dollars, which its original projector saw would be an immense source of profit, literally filled to the level of its banks. With a river washing the very stones of the cities, capable of bearing the heaviest merchantmen with the commerce of the world, yet not a mast to be seen moored to its rotten wharves. Such being some of the work to be done, and Congress seeing a spirit of enterprise and energy had lately developed itself, which, if fostered, would make this District what it is clearly destined to be, the centre of the highest civilization of the world.

With such a work to perform, how inadequately it would be accomplished will be patent to all if the new government was to be burthened with these old debts, and could only pledge its credit for less than one-half million of dollars.

Besides it could not have been the intention of Congress to have counted the old debts as those of the District, as it was unknown at the date of the passage of the organic act what the amount of prior indebtedness might be, and particularly as each corporation was continued in existence for five months after the passage of the act, with full power to contract debts (Section 22) to an unlimited extent.

So far as Congress knew, or could know, the old debts on the 1st of June, 1871, might have amounted to more than 5 per cent., and the Government without a dollar in its treasury be utterly without credit or the power to borrow a dollar, or to make contracts for the most needful repairs, because under the organic act no contract can be entered into without the money is first in the Treasury.   Section 37.

Thus the argument of the plaintiffs reduces itself to the most palpable inconveniences and absurdities.

The only possible grounds on which the pretensions of the plaintiffs can be advanced with any show of success is the term "aggregate debt of the District," occurring in Section 14, and the fact that as the new government is made the successor of the old corporations and their property, (Section 41) that it is but equitable it should be burthened with its debts.

But whatever force exists in these arguments is annulled by a consideration of the other sections of the act itself.

In the first place the term "aggregate debt of the District" has no such signification as contended for by the plaintiffs, but finds it proper and full value in the fact that inasmuch as it is the duty of the Legislature to provide for the ordinary and contingent expenses of the government from year to year, and such other expenses and public

improvements as may be deemed expedient, that debts will necessarily be contracted for these purposes, "the aggregate of which shall not exceed the 5 per cent. without the consent of the people."

Again, the fourteenth section in declaring that "no debt, by which the aggregate debt of the District shall exceed 5 per cent., etc., shall be contracted unless," etc.

This evidently referred to a debt to be contracted in the future. The term debt, occurring twice, refers to the same subject.

Again, the fourteenth section after providing that each Legislative Assembly shall provide for the ordinary and contingent expenses, etc., gives the power to contract this debt. Why contract a debt? Evidently for the purpose of carrying out the improvements for which the Board of Public Works was established. If this is so, it excludes the idea of these pre-existing debts being included as a part of the debt of the District.

The ordinary and contingent expenses, together with the permanent improvement of the public streets, sewers, etc., are the legitimate subjects for which the debt of the government may be contracted. The payment of the old debts, which are provided for by Section 40, is not such a duty, and accordingly it was held in a very similar case in the Supreme Court of the United States that " the limitation in the Act of January 22, 1852, of the Legislature of Iowa, amendatory of the charter of the city of Muscatine, and which authorized the Council to levy a tax not exceeding 1 per cent. on the assessed value, in any one year, of the property of the city, is a limitation touching the exercise of the power of taxation in the ordinary course of municipal action. It does not apply to a case where a judgment has been recovered against the city." Butz *vs.* Muscatine, 8 Wall., 575.

In referring again to the powers of the Legislative Assembly in Section 20, Congress declares "nor shall said

Territorial Government have power *to borrow money or issue stock or bonds* for any object whatever, unless specially authorized by an act of the Legislative Assembly, passed by a vote of two-thirds of the entire number of the members of each branch thereof, but said debt in no case to exceed 5 per centum of the assessed value of the property of said District, unless authorized by a vote of the people, as hereinbefore provided."

The debt here spoken of, in the ordinary construction of language, refers to what immediately precedes it in the same section, namely, *the borrowing of money and issuing of stock* by the Territorial Government, and in so far as it does, indicates that the debt spoken of is to be a new debt of the District in its unity.

But Sections 22 and 40 are more conclusive still of the interpretation of the phrase "Aggregate debt of the District," occurring in Section 14.

By the 22d, " that the property within the corporate limits of Georgetown shall not be taxed for the payment of any debt heretofore or hereafter to be contracted by the corporation of Washington, nor shall the property within the corporate limits of Washington be taxed for the payment of any debt heretofore or hereafter to be contracted by the corporation of Georgetown."

And by the 40th, "And the Legislative Assembly shall have power to levy a special tax upon property within the City of Washington for the payment of the debts of said city, and upon property within the limits of the city of Georgetown for the payment of the debts of said city," &c.

Congress in no place refers to these pre-existing debts of the cities as debts of the District, but recognizes them as debts of the respective corporations, and not of the District, to be kept distinct, and to be paid exclusively by the parties who contracted them, and for this purpose the charters of the cities of Washington, Georgetown, and the Levy Court are actually continued by the proviso of Section 40.

That the charters of the respective cities are not repealed so far as the collection of the debts due by them are concerned, is evident from the phraseology; that they are continued "for the collection of *all* just claims against said cities." The funded debt of Washington is a just claim, and if the authorities failed or refused to pay the same on maturity, the only redress would be to bring suit against the debtor corporation, recover judgment, and *after judgment* obtain a mandamus to compel the new government to levy the special tax, as provided for by Section 40, against the particular corporation.   Walkey *vs.* Muscatine, 6 Wall., 481.

The new government could not be sued for the debts of the old, but the old are in accordance with good faith kept in existence for this purpose.

A debt of the District of Columbia is a debt for which the credit of the new Government is pledged in its new character as "A body corporate for municipal purposes," and is used in such sense in the fourteenth section. In other words the term District in the fourteenth section refers to "The District" in its corporate capacity, and not to the members composing it. To illustrate, if three persons, A, B and C, each indebted to third persons in various sums were to form a corporation under a law which prevented the corporation from contracting debts beyond a certain sum, it would hardly be contended that because each of the corporators were individually indebted beyond that sum, that the same should be counted against the corporation, and it consequently prevented from borowing at all.

Another consideration might be further mentioned; that this new Territorial Government was created for the joint and equal benefit of each of the existing corporations, and if, as is the case, the debt of any one of them is greater proportionally than the others in respect to the values of their respective properties, and the debts should be included in estimating a taxation for a system of proposed needful improvement, and by doing which the necessary fund could

not be raised within the limitation, it will be readily seen how the general good has been thwarted by estimating the greater debt of one of its members, and two of the corporations impeded in their development by a debt which they neither contracted nor have received any benefit from.

5. The plaintiffs seek to obtain the injunction upon another ground, namely, that no greater sum can be appropriated to be expended before the expiration of the first fiscal quarter, after the adjournment of the next regular session, than the revenue to be raised in that period. Without entering upon a discussion to show that the power " to issue bonds and to borrow money " is a part of the public revenue, and as much so as the collection of money by taxation, and that it always has been so regarded both in the general and State governments, it will suffice to show, for the purposes of this case, that more than $4,000,000 can be raised by ordinary annual taxation at $2 on the hundred of the present assessments of the old corporations.

The new government organized on or about May 1, 1871, and the present session of the Legislature, may, and they have the right by adjournments, to prolong it until the 31st day of May, 1872. "The next regular sesssion" may therefore not begin until the 1st day of June, 1872, and may by adjournments be continued until May 31, 1873. Now, the time for which the Legislature may appropriate is for the first quarter succeeding this adjournment, namely, until the 1st day of September, 1873, comprising from the beginning two years and three months. On the basis of computation adopted by the plaintiffs themselves more than $4,000,000 could be raised by legitimate taxation, not estimating the increased value of property as it will appear on the assessment of the present year, nor the Government property which has become the subject of taxation. The cause of error of computation in the plaintiffs' bill is that they do not consider that this being the first session—the starting point—they have a right

to tax for the current year, as well as until the end of the quarter after the next regular session. This right of appropriating so large an amount will not occur again after it has been once exercised, for as each Legislature meets the expenses of the session and year will have been already provided for by its predecessor, and it will only remain for them not to provide for the current year but for the quarter after the next regular session.

Besides the limitation of Section 14, in this regard, refers to the ordinary and contingent expenses, and not to the scheme of public improvement proposed by the issue of these bonds.

No danger need be apprehended on the part of the citizens of the District that a debt greater than 5 per cent. of the assessed property will be created.

The Governor pledges himself in his answer that he will not negotiate more than one-half million of dollars until the assessment of the property is made, and then not until and only as the money may be needed, and in no instance going beyond the amount allowed by law.

This frank declaration of the intention of the executive should allay all apprehension on the part of any citizen, and establish the confidence that the affairs of this District are in the hands of him who is conscientious in the discharge of his duties and zealous for the best interests of the citizens of this District.

Mr. Chief Justice CARTTER delivered the opinion of the Court:

While the controversy in this case embraces grave and interesting questions, ably and elaborately discussed, the importance of the issue is practically lessened in the fact that the political power of the District, pending the controversy, has wisely referred the subject to the people, thereby deferring their ultimate action to the popular determination. It is, nevertheless, here to be disposed of, and we will proceed to treat it as a living question.

It will be seen by reference to the bill, answers, and demurrers in this case that the central and controlling subject of consideration is to be found in the issue, whether the loan authorized and the indebtedness proposed to be contracted in the act of the territorial government, of July 10, 1871, is in excess of the authority of the territorial government as established by the organic law of the District. It is charged in the bill that it is, and by the answers and demurrers in different forms denied.

Whether in excess of authority or otherwise, is again made to depend upon the relation of the indebtedness of the antecedent governments within the District to the indebtedness of the District.

If the indebtedness of the corporations of the cities of Washington and Georgetown, and the Levy Court, are by the act of territorial organization brought forward and engrafted upon the government of the District of Columbia to swell its aggregate debt in such wise as to make the District of Columbia, as a whole, debtor to the creditors of these several corporations, it follows that the loan authorized and in process of consummation, is beyond the limitations of the organic act, and *ultra vires.*

If, on the other hand, the several indebtedness of these several corporations remain the several indebtedness of the people and property of the corporations, not having been legally transferred to the shoulders of the present government, the $4,000,000 loan, authorized by said act, and in process of negotiation, is within the limitations of the organic law. These results are made to follow upon the estimated valuation of the property of the District, as conceded in the argument.

Has Congress, therefore, by the organic act of the District, or otherwise, imposed this indebtedness upon the District? The first answer to this question is to be found in an utter want of constitutional power to do it. The Constitution does provide that the property of the private citizen may

be taken for public use upon fair compensation therefor, but in no principle or passage of the Constitution does the authority exist to transfer the property of one private citizen to another without his consent, or to transfer the legal burdens of one citizen to another without his consent. And what is true of natural persons is equally true of corporate persons. The search will be made in vain to find constitutional authority by which one corporate body, without its consent, can be made to bear the burden of another.

From this manifest want of authority to do it, it may be reasonably inferred that Congress did not undertake to do it. That they did not undertake to do it is made manifest in the scheme and by the terms of the organic act. The first section of the organic act provides that that portion of the territory of the United States within the District of Columbia, with the population thereof, shall be *created* into a government. Not that the city of Washington, the city of Georgetown, and the county shall be transmigrated into a government; but that the territory and the people of the District of Columbia shall be created into a government, and, of necessity, without debtor or creditor, either of which is made to depend upon the act of the government posterior to its creation, inasmuch as all indebtedness and credits require parties to create them. The identity between this government and the old one is to be found nowhere. They are different in their geography, property, population, and power. The constituents of the present government is made up of old corporations, incompatible with each other, so far as their antecedent liabilities existed. The present government finds Washington City a large debtor, while Georgetown and the county are comparatively free from debt. To adjudge Georgetown and the county a joint debtor with Washington would be to compel them to respond to an indebtedness which they never created, and the benefits of which they never did and never can realize.

But Congress has not left this question to the force of

logic. The law maker undertook and accomplished the solution of this question in the 40th section of the organic act, wherein it is provided that each of these corporations shall, respectively, pay its own debts and collect its own credits, to its respective and exclusive use, and its respective and exclusive obligation. To this end Congress provided in the same section that the life of the several charters should be extended, with all the rights and liabilities in contract up to the end and time when they should be "fully closed;" bringing the expiring corporations into no other relations with the present government than to make the territorial legislature and other functionaries of the existing government the trustees under the law, and in the *locus quo* of the defunct officers of the former corporations to see that the proper machinery was employed to collect and pay their debts.

Other considerations might be added in aid of this conclusion; considerations drawn from the body of the act, and outside of it; but enough has been said, in my judgment, to satisfy the mind that the complainants might as well have resorted to the trust and mortgage records of the District with a view to ascertain the individual indebtedness of its citizens, and, after having done so, claimed the sum total of such indebtedness as a part of the aggregate debt of the District, for such indebtedness sustains the same relation to the present government as the indebtedness upon which they rely.

This conclusion makes it unnecessary to consider the questions which have been made, and ably elaborated in argument, touching the jurisdiction of the court.

If the merits of the controversy fails to support the injunction, it is needless to inquire into the question of jurisdiction.

And, again, this conclusion makes it unimportant to inquire into the other features of the act, relative to the disposition of this fund when acquired; questions that do

not necessarily involve the power to create the indebtedness, but pertain to the legal mode of disposing of the treasure after it is acquired. It will be time to consider the question of the disposition of this fund after the Government comes into possession of it. There certainly is no legal propriety by injunction, or otherwise, for the court to interfere with it before it exists.

So of the question of taxation that has been raised. This is not a question involving the measure of taxation under the limitations of the act. No tax is levied in the premises, either within or beyond the limitations of the organic act; and it will be early enough to consider whether the law has been violated and the court has power to interfere with that violation by injunction when the violation is attempted.

Mr. Justice MAC ARTHUR said:

Objections are taken to the bill of complainants for the reason that it does not state a case of equity for an injunction. This grows out of the rules of pleading which require special allegations in a suit of this character, showing that the plaintiffs would suffer irreparable injury, or would be subjected to excessive litigation in order to invoke the equitable powers of this jurisdiction. An alleged defect of parties is also relied upon, and it is further contended that, even if the bill were not defective in form, every special allegation stated in the bill is denied in the answer, and that, therefore, the action ought to be dismissed. These objections are only of technical importance, and perhaps might be obviated by a reformation of the record. In this particular instance I would not deem it just to the case to dispose of it without considering the real merits in controversy. I shall, therefore, examine into the substance and law of the record as if it were free from the impeachment of formal objection.

The injunction was issued to restrain the Governor, Secretary and Comptroller of the District of Columbia from signing or selling bonds in pursuance of an act of the Legis-

7DC—13

lative Assembly, approved July 10, 1871. The act, among
other provisions, makes an appropriation of $4,000,000 for
improvements, and authorizes the Governor to issue bonds
to that amount, $1,500,000 to be sold during the year
1871, and the balance between the 1st day of January,
1872, and the end of the first fiscal quarter after the next
session of the Legislative Assembly. One of the grounds
upon which the complainants ask for relief is, that the act
contains several provisions and omissions of provisions in
direct violation of the Act of Congress creating the District
government. To sustain this point it is said that all the
objects of the act are not expressed in its title ; that it does
not show on its face that two-thirds of the members directed
it to go into effect within thirty days ; that before an ap-
propriation could be made the Legislative Assembly was
bound to fix the time of the commencement of its next
session ; that the Board of Public Works are authorized to
make contracts according to a plan, the details of which are
not expressed in the act ; that the Board of Public Works
are to disburse the money on their own warrants, and draw
it out of the Treasury—all of which, it is argued, are in
violation of the organic act. It is unnecessary to consider
the force of these objections ; for, assuming them to be well
founded, it would follow as a legal consequence, that a law so
burdened with infractions would be so utterly void that no
rights could be acquired under it. It would carry on its face
notice of its invalidity, and, therefore, equitable relief prayed
for could not be granted, on the ground that the bonds may
get into the hands of *bona fide* holders, and thereby the tax-
payers compelled to pay them. There can be no *bona fide*
holders of bonds issued in pursuance of an act void on its
face, and the tax-payer could not be prevented from con-
testing their legality in an action at law ; for the bonds
would be illegal and void in the hands of any one who may
purchase them, no matter whether they be purchased in
good faith or not. The doctrine that the mere illegality of

a tax law will not justify the interposition of a court of equity, however much it may have been disputed, or whatever doubts may have existed on the point growing out of the decisions in Osborne *vs* United States Bank, 9 Wheat., 740, and Dodge *vs.* Woolsey, 18 How., 331, is now fully recognized by the Supreme Court of the United States in the recent case of Dow *vs.* City of Chicago, 11 Wall., 108. So that a mere statement of these objections to the act in question ousts the jurisdiction which we are invoked to exercise.

The principal objection to the loan act, which is not apparent upon its face, is, that the four millions of indebtedness which it authorizes would swell the aggregate debt beyond 5 per cent. of the assessments, without submitting the law to a vote of the people. A majority of the court are of opinion that the debts of the old corporations are not to be computed in the aggregate debt of the new government, and as I concur in the views expressed by the Chief Justice respecting this provision of the bill, I refrain from its further discussion.

There still remains the important question whether this court has jurisdiction of complainants' bill. It is a question of singular importance; for it requires us to determine the nature of the government established by the Act of Congress in the District of Columbia. It does not belong to our position or authority to determine what form of government shall exist here. That has been accomplished by the Congress, which is the only competent power to designate the political constructions within the District; and what they have ordained is as conclusive upon the judicial department as on the private citizen. I have carefully examined the essential provisions of the organic law bearing on this subject; and as the question is one of the greatest interest, and as I differ from the learned justice who passed the decree below—for whose pronounced opinions I entertain the profoundest respect—it is proper I should explain the

reasons which have led to my conclusions. It is asserted on behalf of complainants that only a municipality was created by that act in the restricted sense in which that term is understood when applied to city organizations; and that, therefore, the court may, as it has often done, enjoin its officers and exercise its jurisdiction over them, as in case of persons. The theory contended for on behalf of defendants is, that the organic law enacted by Congress provided a form of government for the territory embraced within this District, and conferred upon it general legislative authority within the sphere of its delegated powers. There can be no doubt that the act was formed after the model of the existing territorial governments, and is analogous to them in its general provisions. The slightest inspection will show not only a similarity in the kind of powers conferred, but in the terms and phraseology employed by Congress to convey their intention. It is a rule in construing statutes to compare one law with other laws of the same legislature upon the same or similar subjects, in order to ascertain its meaning; and it is to be inferred that all statutes relating to the same or similar subjects are governed by the same policy, and have the same scope and design. Potter's Dwarris, 189 and note 9. If we find in the statutes respecting the territorial governments the same terms and powers as in that organizing a government "for all that part of the territory of the United States included within the District of Columbia," it follows as a legal and necessary result that similar powers of Government were conferred in both cases. The counsel for the appellees contend that the first section of the organic act constitutes the new Government a municipal corporation for municipal purposes in express terms. There is no doubt in my own mind but that the subsequent sections of the statute provide for a distinct and separate government according to the American idea of that term, subject, of course, like all other territorial governments to the unlimited control and discretion of Congress. Now, if

there is anything inconsistent in the first section with all that follows, it is the duty of the court to consider all the parts of the act in order to render it harmonious, if that be possible. Says Mr. Dwarris, at page 189: "It is the most genuine exposition of a statute to construe one part by another part of the same statute. If any part of a statute be obscure or doubtful, the proper way to discover the intent is to consider the other parts of the act, for the words and meaning of one part of a statute frequently lead to the sense of another, and in the construction of one part of a statute every other part ought to be taken into consideration."

By the aid of this familiar rule of construction I think we can come to a clear apprehension of the terms used by Congress to express their meaning, and at the same time give, as we are bound to give, effect to every part of the act. There can be no doubt respecting the sense most frequently attached to the expression "municipal corporation," which we have seen is used in the first section. It commonly means an incorporation of the inhabitants of a town or city, to enable it to conduct its local affairs, such as the election of local officers, to carry out sanitary and police regulations, and to construct roads and bridges, and keep them in repair. Such were the old charters of the cities of Washington and Georgetown. There appears to be no dispute but that all these duties were transferred to the new Government by the organic law. It has accordingly been provided with a Board of Health, a Board of Public Works, &c., in order that these " municipal purposes " might be fully carried out. Upon the repeal of the old charters there was no other body in whom authority could exist to perform these services. Hence there was a necessity that the new Government should possess all the powers of a municipal corporation, and that it should be able to contract, and to sue and be sued. All this is, however, quite consistent with the grant of powers contained in the body of the statute creating a political Government analogous to those in the Territories. The frame of the law as

well as its details and even its vocabulary indicate that to establish a Government must have been the meaning of Congress. The title of the act is, "To provide a government for the District of Columbia," and upon the face of the first section itself, it is expressed "that all that part of the territory of the United States included within the limits of the District of Columbia be, and the same is hereby, created into a Government by the name," &c.   The other forty sections of the act are consistent with no meaning but the organization of a form of government.   They provide, like the constitutions of the States, or the acts organizing the Territories, for the three co-ordinate branches—executive, legislative, and judicial departments—which, united, constitute with us the highest idea and most perfect form of Government.   The second section declares that "The executive power and authority in and over the District of Columbia shall be vested in a Governor, who may grant pardons and respites for offenses against the laws of said District," &c.   Section 5 provides that "The legislative power and authority in said District shall be vested in a Legislative Assembly, as thereinafter provided," and the eighteenth section supplements this delegation of power by saying that it shall extend to all rightful subjects of legislation.   The grant is in express terms, and as clear as is to be found in any State constitution.   Nothing could be more explicit than the language in which Congress expresses its meaning.   That a grant of legislative power was intended is not only evident from the very words in which it is always conveyed, but this conclusion derives confirmation from the limitations which are imposed upon its exercise. Several of these illustrations afford the highest evidence of this intent.   Who but the executive of such a government could grant pardons and respites to those convicted of crimes against the law?   The eighteenth section declares that the legislative power granted to the new government shall be subject to all the restrictions and limitations imposed upon States by the tenth section of the first article of

the Constitution of the United States, which provides that no State shall enter into any treaty, alliance, or confederation, nor grant letters of marque and reprisal, nor pass bills of attainder. These are constitutional prohibitions that it would be preposterous to apply to a city organization. They are appropriate only to States, or governments similar to them. On looking into the twentieth section we find that the Legislative Assembly shall not have power to pass any *ex post facto* law, or law impairing the obligation of contracts, and the preceding seventeenth section declares that it shall not pass special laws in the cases therein mentioned, and all of which are similar to the corresponding safeguards interwoven in the text of the State and territorial constitutions; but they would be solecisms in the charters incorporating our towns and cities. The same conviction is produced by the special grants contained in other parts of the act. It must be admitted that public and private corporations, such as the Legislative Assembly are authorized to create, and the right to modify the practice of, and to vest the superior courts with an increase of jurisdiction, extending to new subjects affecting persons and property, require the exercise of the highest legislative power. These are among the conferred powers of the new government, besides being provided with a governor, a secretary, and a delegate in Congress, as in the case of the other Territories. It is impossible for me to draw any conclusion from such numerous intimations of the meaning of Congress than those in favor of the creation of a new government.

Congress thought it appropriate to adopt the Supreme Court of the District, which was previously in existence, as the judicial department of the new government so far only as was necessary for the due execution and enforcement of the laws of said District. The court of course retains its character as a federal tribunal, and its general jurisdiction in law and equity in all respects as it possessed them prior to the passage of the Act of February. Its connection with

the District government is confined entirely to a right in the latter to modify its practice and to confer upon it a jurisdiction in which its legislative acts might be expounded and enforced.

We have here, then, not only a government in name but in form and substance. It is to be observed in this connection, as I have previously suggested, that it is a political maxim in the formation of all the State constitutions that these three departments—executive, legislative, and judicial—comprise the functions of an organized government, and we are equally well informed respecting the legal terms and language by which they are called into form. And when Congress enacts a law consisting of executive, legislative, and judicial departments we know what they intended to establish, because they have employed the form and expression which they have used in all other cases when organizing new governments. We are not to impute to the National Legislature that throughout forty sections of this act they have used, with every variety of expression and detail, words and terms with a meaning different from that which long and settled usage had attached to them, and it is not to be supposed that they intended that these words should not be received in the same sense in which they are always understood in other acts of legislation or constitutional law. Shall forty sections, some of them of great length, and all of them, so far as this question is concerned, expressed in clear and unambiguous language, be deprived of their usual interpretation for the purpose of denying that the new government is the depository of the power which is conveyed by the ordinary use of the same terms? I apprehend this court possesses no such authority, and that the District is entitled to the full benefit, if it be a benefit, of its fundamental law.

The consideration which I have given to the body of the organic act is, I think, conclusive in determining the meaning of the language used in the first section. It would be

unreasonable to impute to the Congress inconsistent intents in the same act. What it has said in so many forms of expression throughout its extended provisions must be the best evidence of what it intended to say by one or two expressions in the beginning. It has appeared obvious to me, as previously explained, that inasmuch as the trusts conferred in the old corporations were as a consequence of their extinguishment transferred to the territorial government; and inasmuch as the organic act had provided the the latter with subordinate officers for the purpose of performing these functions it was quite appropriate to give it in terms all the powers of a municipal corporation in addition to the governmental authority which I have shown it to possess. Indeed it was necessary that these municipal duties should be imposed in direct and positive terms upon the new government, as the old corporations had been swept away. But besides this explanation it is easy to show that the term municipal purposes admits of a meaning as extensive as municipal law. Blackstone defines municipal law as a " rule of civil conduct prescribed by the supreme power of the State, commanding what is right and prohibiting what is wrong," and to nearly the same effect is Chancellor Kent.

Mr. Pomeroy, in a recent work of great erudition on this subject, says: "I shall define municipal law in a State to be the body of rules by which the supreme power in a State is guided in its governing action." "The municipal law is that of a particular State." The laws of England, or America, or of France, is each a municipal law. The body of the laws which govern a commonwealth is called the municipal law of that dominion as distinguished from the law of nations. Hence the powers and duties of rulers, the jurisdiction of courts, the punishment of crimes, the limitations of written constitutions, as well as the trusts conferred by the charters of cities, are all included within the meaning of municipal purposes. This latter term, therefore,

without any forced construction, is susceptible of an import which will enable the court to give it full effect without controlling and rendering almost unintelligible the principal provisions of the entire statute.   Mr. Dwarris, in his chapter on qualified interpretation, uses the following language: "In construing acts of Parliament, judges are to look at the language of the whole act, and if they find in any particular clause an expression not so large and extensive in its import as those used in other portions of the act, and upon a view of the whole act they can collect from the more large and extensive expression used in the other part the real intentions of the legislature, it is their duty to give effect to the larger expressions.   For, as has before been stated, the court is to give effect to every clause, section and word if an effect can be given to it." (Page 191).   According to this rule of interpretation the expression in the first section of the Act of February 21, 1871, about a municipal corporation must be considered with reference to the larger and more extensive delegations of power in other parts of the law.   The main design of the bill was to provide a government for the District of Columbia; incidental to this it was to exercise all the powers of the defunct corporations. We are at liberty to adopt that meaning of a word capable of a two-fold construction which will best comport with the body of the statute so that we may give effect to the intention of its framers.   It seems to me that to hold that the first section is to control the purview of the statute is to invert the rules of interpretation, and to turn its detailed provisions into pretentious verbiage and a rhetorical exaggeration of legal terms never equalled.   The understanding I place upon the law gives effect to every word and clause it contains, and is therefore sanctioned by the soundest canons of construction.

From the conclusions already arrived at it will be seen that, in my opinion, the government of this District stands upon the same footing as that of any of the States or Terri-

tories within the limit of the law from which it derives existence. It is a cardinal principle in our political systems that the great divisions of government—the executive, legislative, and judicial—are to exercise their respective powers free from the interference of each other. Mr. Potter, in his recent work on Statute and Constitutional Law, at page 336, observed: "These departments are co-ordinate in degree to the extent of the powers delegated to each of them. Each in the exercise of its power is independent of the other, but all rightfully done by either is binding upon the others." This is but the expression of a principle which all admit in the abstract, and we are familiar with it in the written constitutions of the States. The doctrine that the judiciary cannot interfere with the exercise of executive functions has been recognized by the Supreme Court more than once. In the case of Madison vs. Marbury, Chief Justice Marshall uses the following emphatic language: "It is scarcely necessary for the court to disclaim all pretentions to such a jurisdiction. An extravagance so absurd and excessive could not have been entertained for a moment. The province of the court is solely to decide on the rights of individuals, not to inquire how the executive or executive officers perform duties in which they have a discretion. Questions in their nature political, or which are by the Constitution and laws submitted to the Executive, can never be made in this court." The court in that case issued a mandamus to a member of the Cabinet, commanding him to perform a mere ministerial act affecting the right of an individual; but they add in reference to even such an officer: "Where the head of a department acts in a case in which Executive discretion is to be exercised, in which he is the mere organ of executive will, it is again repeated that any application to a court to control, in any respect, his conduct would be rejected without hesitation." The Supreme Court has never since deviated from these conclusions, and when within our own recollection, it was asked

to restrain President Johnson from enforcing the reconstruction acts in Mississippi the bill for that purpose was not permitted to be filed upon the express ground that the court had no jurisdiction to suspend a public law by arresting the executive power vested by the Constitution in the President, even upon the pretext that the law was alleged, in the strongest terms, to be unconstitutional, illegal, and void.

It is readily admitted that the Governor of this District is far from being equal in rank and power with the President, nor is it claimed that he is clothed with all the powers of our State executives; but the independence of the Governor of this District is not based upon the extent but upon the nature of the powers vested in him. The principle is not based upon the idea that the American executive possesses sovereign power like the king in a monarchy. On the contrary, our rulers, whether presidents or governors, possess only such powers as the Constitution and the laws confer upon them. For example, the Act of February 21 provides that the Governor may grant pardons, sign such bills as he approves, and veto such as he may return with his objections. It is scarcely necessary to argue that the judiciary could not control or stay him in the performance of duties so expressly confided to his discretion. We would not enjoin him from the exercise of executive clemency towards a convict he was about to pardon, or compel him to grant a pardon where he had refused one. And the same is equally true respecting the whole line of duties limited by law. A distinction has been taken between this class of executive duties and such acts as are ministerial and relate to the vested rights of individuals. This is a proper deduction from Madison vs. Marbury. It was held that the relator in that case had a vested right in the commission appointing him a justice of the peace for this District, and that the Secretary of State, in whose office it had been deposited, should be compelled to deliver it. It was held that he had a vested right in the commis-

sion, and that therefore the court had jurisdiction to enforce it. The rule of jurisdiction is set forth by the court as follows—speaking of the head of a department: "Where he is directed by law to do a certain act affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President, * * * as, for example, to record a commission or a patent for land which has received all the legal solemnities, or to give a copy of such record; in such cases it is not perceived on what grounds the courts of the country are further excused from the duty of giving judgment, that right be done to an injured individual, than if the same services were to be performed by a person not at the head of a department."

It is not perceived how this doctrine is applicable to a case like the present, for the examples put by the court in Madison *vs.* Marbury are clearly not executive acts. In a case where the law gives an absolute right to an individual, as to have a patent for land, or a record of an instrument, there is nothing but an act to be performed purely ministerial, and in such a case the court may interfere to protect a vested right. But when was it heard that a governor could be enjoined from enforcing the execution of a general law which conferred no individual rights, but which only affected public rights. Such an intermeddling is unheard of, and in the language of Chief Justice Marshall, should be rejected without hesitation. The complainants are certainly entitled to a fair and respectful hearing, but they do not pretend that the legislative act of which they complain has relation to them solely as individuals, or that it is a private act in the sense that it affects only their individual interests. The District act is public law, and is of public interest. No special injury peculiar to these complainants is stated in the bill. The only grievance they can suffer consists in the probability, if not certainty, of increased taxation, which, however, will fall to the expe-

rience of every taxpayer in the District. No private damage is pretended. Now, no doctrine is better settled than that a bill to restrain the enforcement of public law cannot be maintained unless the plaintiff is threatened with an injury peculiar to himself, and the special grievance of which he complains must not only be possible and imminent, but be clearly set up. Miller vs. Grundy, 13 Mich., 550; Hale vs. Cushing, 6 Mich., 425; Roosevelt vs. Drake, 23 N. Y., 318; Doolittle vs. Sup., 18 N. Y., 162; Dow vs. Chicago, 11 Wall.

No such case is presented here, and indeed no such case can by possibility be stated as the facts now exist. There is only a claim that the law is invalid, but no debt has been created, no bond issued, no tax nor assessment made, and therefore no individual injury could have occurred. There is no allegation or pretence that these defendants are about to, or threaten to, embezzle the public funds, or that they intend to divert them from the purposes contemplated by the law, or that there is a conspiracy among them to plunder the proceeds of the loan to their own own use. If such a case were presented upon the pleading and proof this court would certainly exhaust the whole power of its jurisdiction to prevent the perpetration of so great a crime. But we cannot assume the existence of a plot so infamous without either allegation or proof upon the record. The rules of law and evidence which govern judicial deliberation would not sanction that mode of determination, nor indeed do the necessities of the case or the expectations of the counsel require that we should overturn the settled rules of evidence in pronouncing judgment. I think it may be certainly assumed that this court will never overlook official corruption when brought to judicial notice, but will extend to it the strong and salutary discipline of the law.

But if this court should establish the rule that a party who should allege that the Legislative Assembly had

exceeded its authority in the passage of a general law, might thereupon ask an injunctional order to restrain the Governor from carrying it into effect, it would render all legislation subject to be suspended at the request of any member of the community whose fears or fancies might induce him to cast an imputation upon its validity. Government would certainly become greatly impaired, and it would not be too much to anticipate that some other method would have to be devised to carry on its affairs.

In the construction which I have placed upon the organic act I have purposely refrained from discussing the question whether it was constitutional. If it is unconstitutional in view of the effect I give it, in my opinion that conclusion would invalidate the entire government of the District. This is too important and transcendent a question to be decided without having been made in the argument or on the submitted briefs of counsel. When that question shall be fully and fairly brought before the court it will then be adjudicated as its importance demands.

For the reasons which I have assigned I am opinion that the court has no jurisdiction of the bill in this case, and that the decree allowing the injunction should be reversed and the bill dismissed.

Mr. Justice WYLIE delivered a dissenting opinion as follows:

I am constrained to dissent from the judgment of the court which has just been pronounced in the present case, and propose to state very briefly a few of the reasons for my opinion :

Previously to 1st of June last the territory of this District embraced two municipal corporations, namely, the city of Washington and the city of Georgetown, and one *quasi* corporation, denominated the Levy Court of the District of Columbia.

On the 21st of February last the Congress of the United States passed an act entitled " An act to provide a govern-

ment for the District of Columbia," which, however, was not to go into operation till the 1st day of June thereafter.

The first section of this act declares, " that all that part of the territory of the United States included within the limits of the District of Columbia be, and the same is hereby, created into a government by the name of the District of Columbia, by which name it is hereby constituted a body corporate for municipal purposes, and may contract and be contracted with, sue and be sued, plead and be impleaded, have a seal and exercise all other powers of a municipal corporation not inconsistent with the Constitution and laws of the United States and the provisions of this act."

The counsel for the defendants have expended much argument in this case, to prove that the new organization, created by this act, is not a municipal corporation, but a government of some other kind, and invested with some sort of sovereignty which places both it and its functionaries above the jurisdiction of the court.

The act of Congress which created this corporation declares it shall be a body corporate, for municipal purposes, and may sue and be sued. The officers appointed under this corporation can hardly be entitled to immunity from suit when the corporation itself is liable to suit. It is quite certain that the powers conferred upon it are more extensive and discretionary than are usually granted to municipal corporations, and in many respects are such as Congress has been in the habit of granting to the governments created for its several Territories.

Nevertheless, it falls strictly within the description given by Mr. Wilcox, of a municipal corporation, as follows: " When the people of a particular place, such as a city or town, are declared by competent authority to be incorporated, and are empowered to appoint one or more officers among them, they are constituted a municipal corporation, and the place is become a municipality." Wilcox on Corp., 15.

It is of no importance, in my judgment, by what name

we call our new government. It may be sued, and so may its officers; and neither it nor they can exercise any functions, or do any act, except such as it or they are authorized to perform by the law which gave them existence and defined their powers.

The people of a State, or of a corporation, however, may be brought under liability to pay bonds or other obligations issued in its name, by its proper officers, even when such bonds or obligations have been issued contrary to law, provided they be payable to bearer, and are in the hands of a *bona fide* holder. This principle has been settled by the Supreme Court of the United States, not in one, two, or three decisions only, but in a numerous series, too recent and too well known to the country at large, as well as to the profession, to require citation.

If the bonds are once issued and signed by the proper officers, and on their face profess to be in pursuance of law the injury to the tax-payer is irreparable. For when the taxes are paid no man can tell how much of his own taxes is to be applied to the payment of the illegal bonds, or the interest upon them, and how much to other objects; and if he could ascertain such amount it would not avail him, since, however illegal the issue of the bonds may have been, the people are still obliged to pay them. They must suffer for the acts of their own agents. It is true that as to the people of this District, they have been vouchsafed but a small participation in the present government, and no voice whatever in the selection of its officers. They are permitted to choose for themselves the members of one branch of the legislature only. But that is enough to bind them to responsibility, rather, to be sure, through a fiction of law than a practical truth.

The position, therefore, that the taxpayer can have his remedy at law against the tax collector is an egregious error. The illegal bonds once issued, and in the hands of an innocent holder for value, become valid obligations, and

7DC—14

a mandamus would be granted to compel the corporation to levy the taxes required to pay them.

The only plank left to the taxpayer, therefore, is the injunction to arrest their issue—that right arm of the incomparable jurisdiction of a court of chancery. Is it possible—can it be believed—that in such a case any court of equity would turn a deaf ear to his complaint, and thus prove itself unfaithful alike to its own honor and to its trust?

But it has been said that the courts have no right to interfere with the legislative branch of the government. The courts do not thus interfere; but they will declare an unconstitutional act to be void, and to prevent irreparable wrong will arrest the execution by any officer of such a pretended law. This power they enforce between themselves. A judgment passed by a court not having jurisdiction over the subject is void, and the sheriff or marshal who attempts to enforce it is held to be a trespasser. In like manner a void law shall afford no protection to the executive officer who obeys it. He will be liable in damages for his act, if that form of redress be available; and if it be not available, the court of chancery must restrain his act by injunction, and crush the wrong before its birth.

The history of these municipal corporations in this country and in recent times is not such as to commend any one of them to our confidence in advance. Extravagance, mismanagement, peculation, corruption, upstart wealth and venality (the latter reaching even to the fountains of justice) on the part of those in possession of their control; and burthensome taxation on the part of the people have been too often the rule. Thank God, these fearful results have not as yet been realized amongst us. But our government has not yet reached the sixth month of its existence, and there are ominous symptoms in our condition. Nowhere more than here is the principle of *obsta principiis* of greater necessity, when we consider that under the very law itself

which governs us every man's property in the District has been placed at the mercy of the needy and mercenary, with an invitation to divide it amongst themselves through the simple process of a vote, and our rulers have been placed beyond the reach of those who may be wronged and oppressed by their acts. If the latter can find no protection in the court, helpless indeed is their condition.

I shall now proceed to examine whether, in the case before the court, the officers of the government of this District are authorized by the charter to issue the $4,000,000 of bonds in question.

As has been stated already, the act for creating the new government was passed on February 21, 1871, but did not go into effect until June 21 thereafter.

On the 10th of July the Legislature of the District passed an act entitled "An act making appropriations for improvements and repairs in the District of Columbia, and providing for the payment thereof."

It appropriates $4,000,000 to be laid out in improvements "until the expiration of the first fiscal quarter after the adjournment of the next session of the Legislative Assembly;" and provides for the issue of a like amount in bonds of the corporation with 7 per cent. interest, payable to bearer.

The organic act declares that "no debt by which the aggregate debt of the District shall exceed 5 per cent. of the assessed property of the District, shall be contracted, unless the law authorizing the same shall, at a general election, have been submitted to the people, and have received a majority of the votes cast for members of the Legislative Assembly at such election." The law in question was passed before any assessment had been made of the property in the District, and was not submitted to a vote of the people.

At the date of the passage of this law the aggregate debts of the old corporation of the District already amounted

to nearly, if not quite, 5 per cent. on the assessed value of the property of the District. So that, if these debts are to be taken into account, the issue of the $4,000,000 of bonds, as proposed in the law, would swell the aggregate debt of the District greatly beyond the limit prescribed by the charter.

The complainants, as taxpayers in the city of Washington and District of Columbia, insist that these debts ought to be taken into the account; and the defendants, on the other hand, insist that they compose no part of the debt of the District. And this is the main, central question in the present controversy, and the only one remaining which I propose to discuss. Other questions of great interest and importance are presented upon the pleadings, and have been argued by counsel, but their consideration would protract this dissenting opinion to an inconvenient length.

The first section of the organic law, or charter, creates a new corporation embracing the whole territory of the District of Columbia; and the fortieth section declares that on and after the 1st day of June, 1871, the charters of the cities of Washington and Georgetown, and the powers of the Levy Court of the county of Washington, and all their several officers, should be abolished; and the forty-first section declares "that upon the repeal of said charters the new corporation or government of the District of Columbia be, and is hereby, declared to be the successor of said corporations, and all the property of the said corporations, and of the county of Washington, shall become vested in the said District of Columbia."

Thus the charters of the old corporations and their officers were all abolished and their property and corporate franchises transferred to the new corporation, which Congress declared should be their successor, under a new charter.

Now, the meaning of this word, "successor," is well and clearly settled in the language of the law. As to debts and

rights, the successor is identified with that which preceded it—it is the same.

In Colchester *vs.* Seaber, 3 Burr, 1866, a bond was taken in 1735, payable to the corporation of Colchester ten years after date. Subsequently the name and organization of the corporation were twice changed by new charters; and besides in 1740 a judgment of ouster had been rendered against all the officers of the corporation, and their places remained vacant till 1763. In 1765 an action on the bond was brought by the new corporation in its own name as though the bond had been made to itself and not to the old corporation; and the defendant pleaded *non est factum* to the declaration.

Lord Mansfield said: "Many corporations for want of legal magistrates have lost their activity and obtained new charters. And yet it has never been disputed but that the new charters revive and give activity to the old corporations, except, perhaps, in that case in Levinz, where the corporation had a new name, and even then the court made no doubt. Where the question has arisen upon any remarkable metamorphosis, it has always been determined that they remain the same *as to debts and rights*." * * * "With respect to the power of entry for condition broken, the general rule of the common law was that none shall take advantage of conditions executory who are not parties or privies; and of the latter none but such as are privies in right; for neither privies in estate nor privies *en fait*, nor privies in law, shall take such advantage, but privies in right shall; and, therefore, if a corporation, whether sole or aggregate, ecclesiastical or temporal, make a lease upon conditions, the successors may enter for condition broken, for they are privy in right; or, in another point of view, are the same body or person who made the lease and imposed the condition, and therefore they may, perhaps, be considered to have a right to enter for condition broken, rather as parties than as privies." Grant on Corporation, 151, citing Co. Litt., 2146.

And the same author, page 8, says: "On the other hand two corporations may be made one by uniting one to the other, and in such case the corporation to which the accretion is made may sue upon a cause of action arising in respect of a thing in possession or a right vested in the other previously to the junction. In like manner where a right of action existed before the union against one of the corporations it still subsists, and may be sued upon against the compound corporation." Citing 6 Vin. Abr., 286; pl. 10 Yearb., 20, Edw., 4; fol. 6, pl. 7 London and Brighton Rwy. Co. *vs.* Goodwin, 3 Exch. R., 329.

In Chesapeake and Ohio Canal Company *vs.* Baltimore and Ohio Railroad Company, 4 Gill & J., 1, it was decided by the Court of Appeals of Maryland "that where a corporation having vested rights is authorized by a new charter to surrender them to a new company, which the new one accepts, the latter stands in the place of the former."

But the very point now under examination was settled by the Supreme Court of the United States, in the case of the Philadelphia, Wilmington and Baltimore Railroad Company *vs.* Howard, 13 How. R., 332.

On the 12th of July, 1836, a contract was entered into between Mr. Howard and the Wilmington and Susquehannah Railroad Company, which became the cause of action in the suit. Subsequently, by acts of the Legislature of Maryland, the Wilmington and Susquehanna Company, the Baltimore and Port Deposit Company, and the Philadelphia, Wilmington and Baltimore Railroad Company were consolidated under the name of the latter company.

The contract being in the name of the Wilmington and Susquehanna Company, and the action brought against the Philadelphia, Wilmington and Baltimore Company, the latter pleaded *non est factum*—that the deed was not of its making.

Evidence was offered by the plaintiff to prove by admis-

sions of its officers, made at a former trial against the old company, that the contract has been executed by that company. The evidence was objected to by the defendant, but admitted, and to this ruling defendant's counsel excepted.

The opinion of the court was pronounced by Mr. Justice Curtis, and is as follows: "It is objected that the parties to that suit were not the same as in this one; but this is wholly immaterial. The evidence does not derive its validity from any privity of parties. It tends to prove an admission by the corporation that the instrument was sealed with its seal. It is further objected that the admission was not made by the defendants in this action, but by the Wilmington and Susquehanna corporation. It is true that the action in the trial of which the admission was made, being brought before the union of the corporations, was necessarily in the name of the original corporation; but, as by virtue of the act of union, the Wilmington and Susquehanna company, the Baltimore and Port Deposit company, and the Philadelphia, Wilmington and Baltimore company were merged in, and constitute one body corporate, under the name of the Philadelphia, Wilmington and Baltimore Railroad Company, it is very clear that at the time the trial took place in Cecil County Court, all acts and admissions in that case, though necessarily in the name of the Wilmington and Susquehanna company, were done and made by the same corporation which now defends this action."

The judgment in this case was affirmed, and a debt which had been contracted by the original company was held to be the debt of its successor—the Philadelphia, Wilmington and Baltimore Railroad Company.

It appears to me, therefore, to be perfectly clear—may I not say it appears absolutely demonstrated—that the several debts of the corporations which formerly composed the District of Columbia, are at this hour as much the debts of the new government as though they were the debts of its own

contracting, unless some other provisions of the organic act can be found which plainly absolves it from the obligation. It has been argued, however, that the obligation to pay those debts and liabilities has not been so transferred to the new government or corporation, in consequence of the special provisions contained in the fortieth section of the act. That section reads as follows:

"SEC. 40. *And be it further enacted,* That the charters of the cities of Washington and Georgetown shall be repealed on and after the first day of June, A. D. eighteen hundred and seventy-one, and all offices of said corporations abolished at that date; the Levy Court of the District of Columbia and all offices connected therewith shall be abolished on and after said first day of June, A. D. eighteen hundred and seventy-one; but all laws and ordinances of said cities, respectively, and of said Levy Court, not inconsistent with this act, shall remain in full force until modified or repealed by Congress or the Legislative Assembly of said District; that portion of said District included within the present limits of the City of Washington shall continue to be known as the City of Washington, and that portion of said District included within the limits of Georgetown shall continue to be known as the City of Georgetown; and the Legislative Assembly shall have power to levy a special tax upon property, except the property of the Government of the United States, within the City of Washington, for the payment of the debts of said city; and upon property, except the property of the Government of the United States, within said District, not included within the limits of said cities, to pay any debts owing by that portion of said District: *Provided,* That the charters of said cities severally and the powers of said Levy Court, shall be continued for the following purposes, to wit: For the collection of all sums of money due to said cities respectively, or to said Levy Court; for the enforcement of all contracts made by said cities, respectively, or by said Levy Court, and all taxes, heretofore assessed, remaining unpaid;

for the collection of all just claims against said cities, respectively, or against said Levy Court; for the enforcement of all legal contracts against said cities, respectively, or against said Levy Court, *until the affairs of said cities, respectively, and of said Levy Court, shall have been fully closed;* and no suit in favor of or against said corporations, or either of them, shall abate by reason of the passage of this act, but the same shall be prosecuted to final judgment as if this act had not been passed."

The obligation to pay a debt is one thing and the mode of raising the money with which to pay it is another thing. This section of the act relates to the latter alone. On the 1st of June, all the offices belonging to the old corporations were abolished, but their debts were preserved by the law, in justice to their creditors. But how is a corporation to pay its debts which has no officers, no organization, no property and no power to levy taxes? How could such a thing be sued? How could the corporation known as "The Mayor, Board of Aldermen, and Board of Common Council of the City of Washington," exist after the law had declared that there shall be no Mayor, no Board of Aldermen, and no Board of Common Council, and no officers of any description whatever?

Blackstone says (Comm., Book. 1, Ch. 18): "The debts of a corporation, either to or from it, are totally extinguished by its dissolution, so that the members thereof cannot recover or be charged with them in their natural capacities."

To prevent such a catastrophe in the present instance the law provided that the new government should be the successor of the old corporation, both as to their rights and obligations. It was not within the competency of Congress to deprive a corporation of its officers, its organization, its franchises and its property, and yet declare it should be liable for its obligations, except by providing a successor in respect to them all—both "rights and debts," as was said

by Lord Mansfield in the case I have cited. It was within its competency, however, to direct the new corporation in what way it should proceed to raise the means of meeting the obligations of its predecessors which Congress had imposed upon it, and it has done so. As to the debts of the corporation, " The Legislative Assembly shall have power to levy a special tax upon property within the City of Washington for the payment of the debts of said city." And a like provision is made for paying the debts of the other corporations. Why were these directions provided? For the reason that each of the old corporations was presumed to have derived exclusive benefit from the proceeds of these debts. The tax is not to be levied upon property of the corporations, for they had none after the 1st of June, 1871, but upon property situated within the respective limits which belonged to them during their existence—upon property of individuals.

A similar provision is to be found in this very law of the new government for creating the debt of $4,000,000, which provides in Section 4, " That the aforesaid four millions of dollars shall be paid out of the general improvement fund herein provided for, and be charged against the cities of Washington and Georgetown, and the county of Washington, in the proportion of the improvements which shall be made therein; and that special taxes in accordance with Section 37 of the organic act shall be levied in sections, wards or districts of Washington, Georgetown, and the county of Washington, to pay the cost of the particular local improvements which may be made therein, according to the plan of the Board of Public Works aforesaid."

It is likewise declared in the twenty-second section of the organic act " That the property within the corporate limits of Georgetown shall not be taxed for the payment of any debt heretofore or hereafter to be contracted by the corporation of Washington, nor shall the property within the corporate limits of Washington be taxed for the payment of

any debt heretofore or hereafter to be contracted by the corporation of Georgetown; and so long as said cities shall remain under distinct municipal governments the property within the corporate limits of said cities shall not be taxed, for the local benefit of the other; nor shall said cities, or either of them, be taxed for the exclusive benefit of the county outside of the limits thereof; *Provided,* That the Legislative Assembly may make appropriations for the repair of roads or for the construction or repair of bridges outside the limits of said cities."

If it be true in law that any debt contracted by the new corporation, or any debt which has been imposed upon it as the successor of the former corporations, is not to be considered its debt, for the reason that the means of its payment are required to be raised by special taxation upon some of the territorial departments into which the District of Columbia still continues to be divided, I can see no limit to the power of the new government to run into debt.

The act declares that "that portion of said District included within the present limits of the city of Washington shall continue to be known as the city of Washington, and that portion of said District included within the limits of the city of Georgetown shall continue to be known as the city of Georgetown," etc.

By the help of this invention, therefore, the new government might go on increasing the debt by new loans to any amount, even without submitting its propositions to a vote of the people, and its debt would never be the larger, because the taxation for its payment must be apportioned upon the several territorial departments of the District, in proportion to the benefits they may have derived from the expenditure of the money in the public improvements within their respective limits.

But it is urged again that the special taxation thus authorized is for payment of the debts of the said cities.

and county respectively; that the debts are not designated in the law as debts which had been or should become debts of the new government.

This is an argument, it seems to me, built upon a mere jugglery in words. The debts referred to on their face and in form were the debts of the old corporations, and were properly so described in the act. It was only by operation of law that they became the debts of the new government. So when a man dies his last debt is paid, and yet, even in the precise language of the law, the debts which survive him are spoken of as being his debts, and the heir of his estate is bound to pay what are still called the debts of his ancestor.

Another instance is that the act in question employs language appropriate to the state of things existing at the date of its passage, February 21, 1871. It did not go into operation until the 1st of June afterwards. At the time of its passage, therefore, and up to the 1st of June, the debts referred to were, in fact, as well as form, the debts of their respective corporations, and could be spoken of only as such in the law.

As to the other provisions of this 40th section, which declares that the "charters" of said cities, and the powers of said Levy Court, shall be continued for the collection of all sums of money, enforcement of contracts, collection of taxes heretofore assessed and remaining unpaid; for the collection of all claims against them respectively, &c.; and that no suit in favor of or against such corporations, or either of them, shall abate by reason of the passage of this act, but the same shall be prosecuted to final judgment, as if the act had not been passed—it seems to have little to do with the question under consideration.

It is quite manifest that by this provision the legislature intended merely to continue in force, in favor of the new government, the charters of the old corporations—not the

corporations—for the purpose mentioned. The old corpo-rate bodies were dissolved, while their charters, respectively, were temporarily continued under their successor. For it is just as impracticable for a corporation to do any act without an organization or an officer, and with no right to either by the law, as it would be for a natural person who had lost his head and been deprived of all his members to perform the functions of a living man.

So, if the law should say that the "Mayor, Board of Aldermen and Board of Common Council" of a city might bring suits, defend actions, collect taxes, &c., after the same law had abolished all these functionaries, it would speak an absurdity and an impossibility. It would not be absurd, however, for the legislature to provide that the charters of the old corporations, which are but acts of Congress, should continue in force for these purposes, after those corpora-tions, with all their officers, had been abolished. As laws affecting the rights and obligations of those bodies, and providing the means for collecting arrears of taxes, they contain many important and useful provisons, which might well be continued in the hands of their successor. It is in this sense only that I understand this provision of the law.

There is still another view of this subject, and probably one which strikes the mind more readily than that upon which I have thus far been speaking—that which was pre-sented with so much clearness on the argument by the com-plainants. It is this: That when Congress declared, in the organic act, that the aggregate debt of the District should at no time exceed the assessed value of the property of the District, this word "District," which occurs twice in the same sentence, was used in both instances in the same sense. It could not be intended by Congress that the word should in this instance apply to the new corporation as a body politic. For, to say that the aggregate debt should in no case exceed 5 per cent. of the assessed value of the property

belonging to the body politic, would restrict the limit of indebtedness to a very small amount indeed. The body politic owns such a small amount of property that it may be said in general terms to have no property at all; and then all the individual property lying within the territory would be exempt from taxation. The word, therefore, must be taken in its sense of territorial limits. Hence, it follows that the "aggregate debts" in the sense of the law, are those which are chargeable upon all the property belonging to individuals, and situate within the limits known as the District of Columbia, and these debts include the debts as well of the former corporations as those of the new one.